## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO._____

UNITED STATES OF AMERICA,

     Plaintiff,                      **JURY TRIAL DEMANDED**

v.

AIMA BUSINESS AND MEDICAL
SUPPORT, LLC,

     Defendant.

_____/

## COMPLAINT

Pursuant to the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "False Claims Act" or the "FCA"), and the common law, the United States of America ("United States" or "Government") files this Complaint against AIMA Business and Medical Support, LLC ("AIMA" or "Defendant") to recover damages for false claims submitted to the Medicare program ("Medicare"). Beginning in 2018, Defendant began submitting, or causing to be submitted, claims to federal health care programs for genetic laboratory tests that were not medically necessary, not ordered by a treating physician, and not prescribed for the diagnosis or treatment of an illness or injury. Defendant also caused the submission of false records or statements that the lab in question was in compliance with Medicare requirements, even though Defendant had knowledge that the lab was not in compliance with the requirements. By knowingly submitting, or causing to be submitted, false claims for reimbursement, and by causing to be made false records or statements, Defendant violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, was unjustly enriched, and was paid by mistake.

## NATURE OF ACTION

1.      From 2018 to 2019 ("relevant time period"), Defendant AIMA submitted thousands of claims for payment to Medicare for cancer genetic testing and pharmacogenetic testing on behalf of Excellent Laboratories Inc. d/b/a Selecta Laboratory ("Excellent" or "Selecta"), a laboratory in Miami, Florida (National Provider Identifier Number: 1427472844) that billed Medicare for expensive genetic tests.

2.      During the relevant time period, Selecta paid AIMA, a business process outsourcing company based in the United Kingdom and India, to submit fraudulent claims to Medicare on Selecta's behalf and to advise Selecta how to maximize profits and ensure its claims got paid. Although AIMA knew Selecta's claims for genetic tests to Medicare were false, AIMA submitted Selecta's claims to Medicare, and Medicare paid for those claims.

3.      The Medicare reimbursements would not have been paid but for Defendant AIMA's misconduct.

4.      The proceeds AIMA received from Selecta were obtained, directly or indirectly, as a result of health care fraud and in violation of the False Claims Act.

5.      The United States brings this action under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, against Defendant AIMA for (a) knowingly presenting, or causing to be presented, to the federal government a false or fraudulent claim for payment or approval; and (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim. 31 U.S.C. §§ 3729(a)(1)(A)-(B). The United States also brings related actions for unjust enrichment and payment by mistake.

6.      Any person who violates the FCA is liable for a civil penalty between $13,946 and $27,894 for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a)(1). The United States therefore seeks damages and penalties in an

amount to be determined as a result of Defendant AIMA's conduct as described herein.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345 because this action is brought by the United States as a Plaintiff pursuant to the False Claims Act, and supplemental jurisdiction under 28 U.S.C. § 1367(a) for the common law cause of action.

8.      This Court may exercise personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) and because Defendant has transacted the business that is the subject matter of this lawsuit in this District.

9.      Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because Defendant transacts or transacted business in this District and a substantial part of the events giving rise to this action occurred in this District.

**PARTIES**

10.      Plaintiff the United States brings this action on behalf of the Department of Health and Human Services ("HHS"), an agency and instrumentality of the United States, and the Centers for Medicare and Medicaid Services ("CMS"), the component agency of HHS that administers and supervises the Medicare program, established by the Social Security Act, 42 U.S.C. §§ 1395 *et seq*.

11.      AIMA began as a family business and is comprised of business entities in the U.K., India, and the United States. AIMA's CEO Aaron Liston resides in and runs the business from the U.K., AIMA's employees are based in India, and AIMA services clients in the United States.

12.      AIMA is registered to do business in Florida as a Florida Limited Liability Company with its principal place of business at 7901 4th St N, Suite 300, St. Petersburg, Florida,

3

33702. At the time of the events that are the subject matter of this lawsuit, AIMA's principal place of business was at 1990 Main St, Suite 750, Sarasota, Florida, 34236. It has had additional addresses at 1613 Fruitville Rd, Sarasota, Florida, 34236, and at One Fenton Main Street, Cary, NC 27511. AIMA is also registered to do business in North Carolina.

13.     In approximately 2016, Aaron Liston took operational lead of the business from his parents, and then formally became the company's CEO.

14.     During the relevant time period, AIMA was a business process outsourcing company that provided administrative services to American businesses at a lower cost by using employees based in India.

15.     In 2018, Selecta, a laboratory in Miami, Florida, required assistance with billing Medicare and other United States insurance plans for laboratory tests, particularly PGx and CGx tests. AIMA offered its assistance and represented that it could provide Medicare and U.S. insurance billing services, and Selecta hired AIMA to advise Selecta and to submit bills to Medicare on Selecta's behalf.

## LEGAL BACKGROUND

### I.     The False Claims Act

16.     The FCA is the primary civil remedial statute designed to deter fraud upon the United States and reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud." S. Rep. No. 99-345, at 1 (1986), 1986 U.S.C.C.A.N. 5266.

17.     The FCA establishes liability to the United States for an individual who, or an entity that: (a) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; or (b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(A)-(B).

18.     Any person or entity who violates the FCA is liable for three times (treble) the amount of the damages sustained by the United States, plus a civil penalty. For the false claims at issue in this case, the current civil penalties are not less than $13,946 and up to $27,894 for each violation. 31 U.S.C. § 3729(a)(1); *see also*, 28 C.F.R. § 85.5 (listing current civil penalty amounts adjusted for inflation for all FCA penalties assessed after February 12, 2024, whose associated violations occurred after November 2, 2015).

19.     The term "knowingly" under the FCA is defined to include actual knowledge, reckless disregard, or deliberate ignorance. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required. *Id.*

20.     It is a violation of federal law to submit or cause to be submitted claims to a federal health care program for services that were not medically unnecessary. Any claims submitted by Defendant or others for genetic laboratory tests that were not ordered by a patient's treating physician or were not for the purpose of treating or diagnosing the patient, are false and/or fraudulent claims within the meaning of the FCA.

21.     In this case, all claims for genetic testing submitted by or on behalf of Selecta were false and/or fraudulent because they were not ordered by a patient's treating physician and were not for the purpose of treating or diagnosing a patient.

22.     AIMA was the sole billing company that advised Selecta and submitted claims to Medicare for genetic tests on behalf of Selecta during the relevant time period.

**II.     The Medicare Program**

23.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare program, to provide health insurance to individuals based on age, disability, or diagnosis with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426-1.

5

24.     Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries." *See* 42 C.F.R. § 400.202.

25.     Medicare defines a "supplier" as "a physician or other practitioner, or an entity other than a provider, that furnishes health care services under Medicare." *Id.* This term includes independent laboratories, such as Selecta. To bill and receive payment for covered services, a supplier must be enrolled to participate in Medicare and receive a billing number. 42 C.F.R. § 424.505.

26.     Medicare consists of four distinct parts: A, B, C, and D.  *See* 42 U.S.C. §§ 1395c-1395i.  At issue in this case are Medicare Parts B and C.

**A. Medicare Part B**

27.     "Part B" of the Medicare program is a federally subsidized, voluntary insurance program that pays for various medical and other health services and supplies, including laboratory testing (e.g., drug and genetic testing), hospital outpatient services, physician services, and therapy services that are medically necessary and ordered by licensed medical doctors or other qualified health care providers. *See* 42 U.S.C. §§ 1395j-1395w-6.

28.     Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and by contributions from the Federal Treasury. Eligible individuals who are 65 or older, disabled, or diagnosed with end-stage renal disease may enroll in Medicare Part B to obtain benefits in return for payments of monthly premiums. It is typical for laboratories like Selecta to submit Part B claims directly to the Medicare program, and for Medicare Part B payments to be made directly under assignment to the laboratory, rather than to the beneficiary.

29.     To enroll in the Medicare program, suppliers of laboratory services must submit a Medicare Enrollment Application, Form CMS-855B. These providers also must complete Form

CMS-855B to change information or to reactivate, revalidate, and/or terminate Medicare enrollment.

30. Form CMS-855B requires, among other things, signatories to certify:

I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in section 2A1 of this application. The Medicare laws, regulations, and program instructions are available through the Medicare Administrative Contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions. . . .

\*       \*       \*

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*See* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855b.pdf.

31. An authorized official must sign the above "Certification Statement" in Section 15 of Form CMS-855B, which "legally and financially binds this supplier to the laws, regulations, and program instructions of the Medicare program." *Id.* At all times relevant to this Complaint, Form CMS-855B contained substantially the same language as that above in its "Certification Statement," and the certification was required for enrollment in the Medicare program.

32. CMS provides reimbursement for Medicare Part B claims from the Medicare Trust Fund. To assist in the administration of Medicare Part B, CMS contracts with Medicare Administrative Contractors ("MACs") (formerly known as carriers). 42 U.S.C. § 1395u. MACs perform various administrative functions for CMS, including processing the payment of Medicare Part B claims to providers.

33. At all times relevant to this complaint, CMS contracted with MACs to assist in the administration of Medicare Part B fee-for-service claims. *See* 42 U.S.C. § 1395u.

7

34.     Laboratories submit claims to MACs for payment, and in turn, the MACs process the claims, applying coverage rules, evaluating eligibility for reimbursement, and paying claims on behalf of the Medicare program.

35.     MACs may issue Local Coverage Determinations ("LCDs") regarding whether or not a particular item or service is covered. 42 U.S.C. § 1395m-1(g). An LCD contains a MAC's policy determination as to whether or not a particular item or service is covered by Medicare in that MAC's jurisdiction.

36.     The MACs are responsible for processing Medicare claims arising within their assigned geographic area, including determining whether the claim is for a covered service.

37.     At all relevant times, Medicare contracted with First Coast Services Options, Inc. ("First Coast") to administer the Medicare Part B program in Jurisdiction N, which includes the state of Florida, including the enrollment of providers and the processing of claims for services rendered to Medicare beneficiaries.

38.     Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. § 424.516(a)(1).

39.     To obtain Medicare reimbursement for certain outpatient items or services, providers and suppliers submit a claim form known as the CMS 1500 form or its electronic equivalent, known as the 837P format.

40.     When submitting claims on the CMS-1500 to Medicare, providers and suppliers certify, among other things, that: (a) the services rendered are medically indicated and necessary to the health of the patient; (b) the information in the claim is "true, accurate, and complete"; and (c) the provider or supplier understands that "payment and satisfaction of this claim will be from

8

Federal and State funds, and that any false claims, statements, or documents, or concealment of material fact, may be prosecuted under applicable Federal or State laws." After a February 2012 revision to the CMS-1500, providers further certify that their claims comply "with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment." CMS-1500 also requires providers to acknowledge that: "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties." These acknowledgments and certifications were required during the relevant time period.

41.     To obtain Medicare reimbursement, healthcare providers (including suppliers) submit claims using paper forms or their electronic equivalents. Providers identify by code on the appropriate form, among other things, the principal diagnosis of the patient and the procedures and services rendered.

42.     Because it is not feasible for the Medicare program or its contractors to review medical records corresponding to each of the millions of claims for payment it receives from providers and suppliers, the program relies on providers and suppliers to comply with Medicare requirements and to submit truthful and accurate certifications and claims.

43.     Generally, once a supplier submits a CMS-1500 or the electronic equivalent to the Medicare program, the claim is paid directly to the supplier, in reliance on the foregoing certifications, without any review of supporting documentation, including medical records.

**B. Medicare Part C**

44.     Instead of enrolling in Medicare Parts A and B, or traditional fee-for-service

Medicare, beneficiaries may opt to enroll in Medicare Advantage ("MA") Plans.[1] *See* 42 U.S.C. § 1395w-21 *et seq.*

45.     Under Medicare Part C, the government pays MA Organizations for the provision of items and services that are covered for Medicare beneficiaries under Parts A and B of the Social Security Act. *See* 42 U.S.C. § 1395w-23; *see also*, 42 C.F.R. Part 422, subpart G. Many MA Organizations contract with physicians, laboratories, or other providers to furnish healthcare items and services under the MA Plans.

46.     If a Medicare beneficiary chooses to enroll in a Medicare Advantage plan managed by an MA Organization, CMS pays the Medicare Advantage plan a set capitation payment for the complete care of the beneficiary, starting as soon as the beneficiary enrolls.

47.     Once a patient is enrolled in a Medicare Part C plan and the MA Organization certifies that the enrollee is validly enrolled, the Government begins paying monthly capitated payments to the MA Organization for the enrolled beneficiary. Each enrollment triggers an automatic capitated payment from CMS.

48.     MA Plans are required to provide at least the same benefits as traditional Medicare (Parts A and B). MA Plans must "provide coverage of, by furnishing, arranging for, or making payment for, all services that are covered by Medicare Part A and Part B." 42 U.S.C. § 1395w–22(a)(1); 42 C.F.R. § 422.101.

---

[1] Medicare+Choice was the predecessor to the Medicare Advantage Program. Any provisions, such as 42 U.S.C. § 1395w-23, that reference Medicare+Choice are "deemed a reference to 'Medicare Advantage' and 'MA.'" *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. 108-73, § 201(b), 117 Stat. 2066, 2176 (Dec. 8, 2003) (codified at 42 U.S.C. § 1395w-21 note).

49. MA Plans must comply with CMS's general coverage guidelines included in original Medicare manuals and instructions unless superseded by CMS's Part C regulations or related instructions. 42 C.F.R. § 422.101(b)(2).

50. No Medicare payment may be made under Part A or Part B for any expenses incurred for items or services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. 42 U.S.C. § 1395y(a)(1)(A). As such, MA Plans may not pay Medicare funds for genetic tests that are not medically necessary. *See* Medicare Managed Care Manual, Chapter 4, Sections 10.2 and 10.16.

## III.   Medicare Coverage for Cancer Genetic/Genomic and Pharmacogenetic/genomic Testing

51. Cancer genomic laboratory testing looks for genetic changes across all the DNA (including the entire set of genes, or genome) in a person or in a specific cell type or tissue. These tests are performed to identify inherited genetic changes that may increase the risk of developing certain types of cancer in the future. They can also help providers determine the appropriate course of treatment for a person diagnosed with cancer. Cancer genetic testing looks for changes in genes, gene expression, or chromosomes in a person's cells or tissues, as opposed to a person's entire genome. Cancer genetic testing can be performed to learn more about a cancer, plan treatment, or find out how well a treatment is working. Cancer genomic or genetic testing are sometimes referred to as "CGx" testing.

52. Pharmacogenomic or pharmacogenetic testing, sometimes referred to as "PGx" testing, detects specific genetic variations in an individual's genes or genomic profile that impact that individual's response to certain medications. PGx tests help determine, among other things, whether certain medications would be effective if used by a particular patient. They also help

11

clinicians with medication selection and dosage, and determining appropriate treatment.

53.     Medicare reimburses only for services furnished to beneficiaries that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. . . ." 42 U.S.C. § 1395y(a)(l)(A); *see also* 42 C.F.R. § 411.15(k)(1).

54.     In addition, the Secretary of HHS is responsible for "promulgat[ing] regulations and mak[ing] initial determinations with respect to benefits under [P]art A and [P]art B." *See* 42 U.S.C. § 1395ff(a). The Secretary acts through formal regulations, and periodically CMS guidance.

55.     At all times relevant to this Complaint, Medicare generally did not pay for diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1). Except for certain statutory exceptions, Medicare did not cover "[e]xaminations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury," such as genetic tests performed for informational or screening purposes. *See* 42 C.F.R. § 411.15(a)(1). Because early detection of cancer is critical, Medicare regulations expressly provided coverage only for certain specific cancer screening tests (but not genetic tests) for patients who lacked signs or symptoms of cancer. Examples of covered cancer screenings included "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.* Both CGx and PGx tests are diagnostic tests.

56.     If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional

requirements before covering the testing. Specifically, Title 42, Code of Federal Regulations, Section 410.32(a) provided:

> All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests **must be ordered by the physician who is treating the beneficiary**, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. **Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary.**

(emphasis added).

57.     When promulgating 42 C.F.R. § 410.32, HHS explained that the policy that diagnostic tests must be ordered by the treating physician "is designed to assure that beneficiaries receive medically necessary services and to prevent patterns of abuse, such as the furnishing of diagnostic tests that are screening (noncovered) services rather than medically necessary services for the diagnosis of the individual patient's condition." 61 Fed. Reg. 59490, 59497 (Nov. 22, 1996). HHS emphasized that this requirement "is fundamental for coverage and payment of diagnostic tests." *Id*.

58.     In its comments, HHS offered specific examples of situations in which a medical provider would not be considered a "treating physician," such as a physician who "is employed for the sole purpose of ordering diagnostic tests (in nursing homes or mobile centers)" or a medical director of a nursing facility who orders screening diagnostic testing for many patients in the facility. *Id.* HHS also included in this prohibition "the questionable testing offered to beneficiaries in public areas such as shopping malls." *Id*.

59.     To comply with the requirements of 42 C.F.R. § 410.32(a) that a treating physician order and then use the lab results, laboratories must keep documentation to demonstrate that these requirements have been met. 42 C.F.R. § 410.32(d)(2)(ii).

13

60.     As a condition of Medicare payment, a physician or other Medicare-qualified clinical personnel must certify that the testing performed is medically necessary. 42 U.S.C. § 1395n(a)(2)(B); 42 C.F.R. § 424.10(a). The physician, nurse practitioner, clinical nurse specialist, or physician signing the certification must have knowledge of the case. 42 C.F.R. § 424.24(g)(2). CMS will deny a claim where the documentation the laboratory keeps does not demonstrate that the service provided was reasonable and necessary. 42 C.F.R. § 410.32(d)(3)(ii).

61.     As set forth below, AIMA billed Medicare on Selecta's behalf for diagnostic laboratory tests that were solicited through nationwide telemarketing calls to Medicare beneficiaries' homes and that were ordered by physicians AIMA knew, or should have known, did not have a valid treating relationship with the beneficiaries. Thus, AIMA presented, or caused to be presented, false or fraudulent claims to the Medicare program.

## THE FRAUDULENT SCHEME AND AIMA'S PARTICIPATION

**I**.     **Selecta's Business Model Was to Target Medicare Patients, Sell Genetic Screening Tests Not Covered by Medicare, and Bill the Tests to Medicare**

62.     Excellent Laboratories, which also did business as "Selecta," was a Florida laboratory owned by Mario Cuervo and located at 7290 SW 42nd Street, Miami, FL 33155.

63.     Prior to 2018, Selecta did not bill Medicare for genetic tests. The lab initially ran toxicology laboratory tests and billed a minimal number of tests to Medicare.

64.     Starting in 2018, Selecta's Medicare billing for genetic tests skyrocketed. Selecta began billing Medicare for genetic tests in or about August 2018, with billing increasing dramatically in the second half of 2018. Between August 22, 2018, and August 13, 2019, Selecta, with help from AIMA, billed Medicare approximately $ 15,178,946.00 for genetic tests.

65.     The drastic increase in Medicare billing corresponded with a change in control of

the laboratory. In or about April 2018, Richard Luzzi and Jamie Nocher, working with other investors, engaged Mario Cuervo, Selecta's owner at the time, in talks to purchase Selecta.

66.     Neither Luzzi nor Nocher had a clinical or medical background. Luzzi was a singer, Nocher was as an actor, and both were engaged in business ventures. For example, Nocher invested in a variety of projects, such as bagel shops and music production.

67.     On or about May 21, 2018, Richard Luzzi and Mario Cuervo signed a management agreement that gave Luzzi and a company called Stride Management Inc. broad control over Selecta and its operations, including control over Selecta's bank accounts and finances, authority to enter into contracts, authority to bill Medicare, and control over Selecta's compliance program.

68.     Luzzi and Nocher both owned Stride Management Inc. and therefore both took control of Selecta under the management agreement. They intentionally left Mario Cuervo as the owner of record with Medicare, including on required Medicare forms.

69.     After taking control of Selecta, Luzzi and Nocher, through various business entities and with assistance from other business partners, began a telemarketing campaign that targeted Medicare beneficiaries and sold them expensive CGx and PGx genetic tests via telemarketing calls to the beneficiaries' homes. The beneficiaries were told that the tests were "free," "paid for by Medicare," and/or involved "no out-of-pocket cost" to the beneficiary. In reality, the genetic tests cost Medicare, and consequently American taxpayers, thousands of dollars per beneficiary that was swabbed for DNA.

70.     The genetic tests were sold to the Medicare beneficiaries by marketers and were not ordered by physicians to diagnose an illness or treat a patient for an illness or disease. The marketers were not clinicians, were not acting under medical supervision, and were not practicing medicine.

II.     **AIMA's Involvement**

    A. **AIMA's Focus was to Maximize Medicare Reimbursements for Profit, not to Provide Compliant Medical Billing Services**

71.     Prior to 2012, AIMA was a medical recruitment company run by a family in the U.K. Its main business was to assist doctors and nurses trained in India to immigrate to the U.K., become retrained, and obtain positions as doctors and nurses at U.K. hospitals.

72.     In response to changes in U.K. immigration policies, AIMA shifted its business model and transitioned to business process outsourcing. In other words, AIMA helped American companies shift work offshore to India to help companies reduce costs.

73.     AIMA's CEO, Aaron Liston, took over his parents' company in the U.K. and led the transition from medical recruitment to business process outsourcing, which showed more promise as a business enterprise.

74.     Liston had an undergraduate business degree from Bournemouth University in the U.K., where he studied operations and project management. He did not have a clinical, laboratory, medical, or medical billing background.

75.     AIMA's outsourcing services were initially focused on the hotel and leisure industry, but after finding a physician who needed basic administrative services for his practice, AIMA began using its India-based employees to provide administrative services for U.S. health care providers. AIMA also built software for companies outside the health care space and continued to work with companies in the events, hotel, and leisure industries.

76.     AIMA's employees were generally based in India, and AIMA's CEO Aaron Liston was based in the U.K.

77.     In approximately August of 2018, shortly after taking control of Selecta, Nocher

and Luzzi engaged AIMA to assist them with billing United States health insurance plans, including Medicare, for lucrative CGx and PGx tests.

78.     The AIMA employees in India who supported Aaron Liston in assisting Selecta used English pseudonyms, such as "Mark Goodman" and "Scott Jones," when working with U.S. clients, but their legal names were Indian names. For example, AIMA employee Scott Jones's legal name was Sudheer Lonappan. In email exchanges between Luzzi, Nocher, and AIMA, AIMA employees used their English pseudonyms rather than their legal names.

79.     AIMA represented that it was a knowledgeable medical billing company, with expertise in compliance and experience working with laboratories. Luzzi and Nocher hired AIMA to provide them with Medicare billing guidance, keep them updated on Medicare guidelines, and handle billing for Selecta.

80.     Selecta and AIMA entered into a Medical Billing Service Agreement effective July 24, 2018. Luzzi signed the agreement on behalf of Selecta.

81.     From the time of the agreement through December 2019, when Selecta was sold, AIMA was the sole billing company that Selecta used to bill insurance, including Medicare.

82.     Nocher, Luzzi, and AIMA CEO Aaron Liston participated in a kick-off conference call, along with other individuals, on August 2, 2018.

83.     Shortly after the kick-off call, on August 4, 2018, via email, Liston sent Nocher and Luzzi sample Explanations of Benefits for CGx lab testing. An Explanation of Benefits ("EOB") is a document that shows, inter alia, how much an insurance company or payer, such as Medicare or private insurance, pays for a claim or service, and how much money a provider makes for the claim or service. The same email from Liston attached several sample EOBs for different insurance plans: one for Aetna, one for Cigna, one for Humana, and two for Medicare Part B.

84.     Through the EOBs, AIMA showed Luzzi and Nocher they could make a substantial profit from various U.S. health insurance plans by selling CGx tests and billing them to insurance plans.

85.     The EOBs further showed that Luzzi and Nocher stood to make a substantial profit particularly by billing Medicare Part B for expensive CGx tests, and especially if they billed Medicare Part B for CGx tests for patients with a personal history of cancer. For example, the EOB illustrating reimbursements for a sample patient with Aetna health insurance showed that Aetna would pay approximately $2,300.00 for a set of cancer genetic testing CPT codes, whereas the EOB illustrating reimbursements for a sample patient with Medicare Part B showed that Medicare would pay approximately $5,887.84 for a similar set of cancer genetic testing CPT codes.

86.     Also on August 4, 2018, Luzzi asked AIMA to send sample EOBs for PGx testing, and AIMA responded with the sample EOBs for PGx testing shortly thereafter. These EOBs showed Luzzi and Nocher they could also profit from billing insurance for expensive PGx tests.

87.     On August 7, 2018, AIMA emailed Nocher and Luzzi a document titled "Hereditary Cancer Testing Billing – First Coast Medicare." The document listed several Current Procedural Terminology ("CPT") codes for cancer genetic testing, and the "expected payment" amounts for each code. The document further stated: "As can be seen from the table, **maximum reimbursement is guaranteed** when the patient has a personal history of cancer which is from the LCD policies L34912 and L36499, whereas there is a decreased payment expectation when the patient has a personal history of cancer that is not part of LCD policy or if the patient has a family history of cancer supported by genetic susceptibility to develop cancer." (emphasis added).



Hereditary Cancer Testing Billing – First Coast Medicare

The below table depicts the adjudication trends in First Coast Medicare for Cancer genetics Samples.

| | | | Expected Payment ────┤ | | | $ 5,068.26 | $ 2,742.91 | $ 2,742.91 |
|---|---|---|---|---|---|---|---|---|
| CPT | Gene | NO. of tests | LCID | DX Required | PH of CA (LCD) | PH of CA (not in LCD) | FH of CA with genetic suscepti-bility to develop CA |
| 81201 | APC | 1 | $ 780.00 | L34519 | No specific DX | $ 780.00 | $ - | $ - |
| 81317 | PMS2 | 1 | $ 707.02 | L34912 | Specific DX | $ 707.02 | $ - | $ - |
| 81403 | EPCAM | 1 | $ 185.20 | L34519 | No specific DX | $ 185.20 | $ 185.20 | $ 185.20 |
| 81404 | CDKN2A | 1 | $ 274.83 | L34519 | No specific DX | $ 274.83 | $ 274.83 | $ 274.83 |
| 81406 | MUTYH/SMAD4 | 2 | $ 282.88 | L34519 | No specific DX | $ 282.88 | $ 282.88 | $ 282.88 |
| 81408 | ATM | 1 | $2,000.00 | L34519 | No specific DX | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 |
| 81432 | 10 GENES | 1 | $ 838.33 | L36499 | Specific DX | $ 838.33 | $ - | $ - |
| 81479 | Multiple genes | 1 | $ - | No LCD | Not covered | $ - | $ - | $ - |

*NB: This is an example panel from another lab.*

As can be seen from the table, maximum reimbursement is guaranteed when the patient has a personal history of cancer which is from the LCD policies L34912 and L36499, whereas there is a decreased payment expectation when the patient has personal history of cancer that is not part of LCD policy or if the patient has a family history of cancer supported by genetic susceptibility to develop cancer.

The relevant LCD policies for CGX testing can be accessed from the below link.

https://drive.google.com/drive/u/0/folders/1890DziOxZZ6l5Sc8mqnSQY__sIG8eHdS

Next page has the DX codes which guarantees payment for CGX panels in First Coast:

88.     The document AIMA sent showed Luzzi and Nocher what First Coast, the MAC administering the Medicare program in Florida, was paying labs at the time for certain cancer genetic tests.

89.     AIMA advised Luzzi and Nocher that Medicare was "guaranteed" to pay them the "maximum reimbursement" for the genetic tests listed as long as they billed for patients who had a personal history of cancer "from the LCD policies L34912 and L36499." LCD ID number L36499 was the LCD for BRCA1 and BRCA2 genetic tests, which test for genes associated with

breast and ovarian cancer. LCD ID number L34912 was the LCD for genetic testing for Lynch Syndrome, which is commonly associated with colorectal cancer. Local Coverage Determinations, or LCDs, are issued by the applicable MAC for a laboratory's jurisdiction. An LCD contains a MAC's policy determination as to whether or not a particular item or service is covered by Medicare in that MAC's jurisdiction.

90.     According to AIMA's advice, Luzzi and Nocher stood to benefit the most by billing First Coast/Medicare for genetic tests for breast and ovarian cancer, and genetic tests for Lynch Syndrome, for patients who had a personal history of cancer.

91.     The document AIMA sent to Luzzi and Nocher also included a link to LCD policies for CGx testing, and a list of diagnosis codes used for billing insurance that would "**guarantee[] payment** for CGX panels in First Coast." (emphasis added). AIMA's representation that payments were "guaranteed" was not true – payments were of course not guaranteed if the CGx tests were not medically necessary or not ordered by a treating physician.

92.     In addition to advising Luzzi and Nocher how to obtain the highest Medicare reimbursements, AIMA was integral and highly involved in formulating Selecta's genetic testing panels.

93.     On August 24, 2018, AIMA sent Luzzi an email stating:

> If you have noticed, your breast and ovarian panel pays better than multiple cancer panel. This is because we are using 81211 instead of 81432 in breast and ovarian panel. Breast and Ovarian panel does not contain 10 genes that make up 81432. **It is advisable to request physicians to order breast and ovarian panel if possible.**

(emphasis added).

94.     In the email, AIMA specifically advised Luzzi and Nocher to persuade physicians ordering cancer genetic tests from Selecta to order the breast and ovarian panel if possible, not the

multiple cancer panel, because the insurance reimbursement amounts were higher for the breast and ovarian panel. In other words, AIMA advised Selecta to tell ordering physicians to choose genetic tests based on how much money Selecta would make from the test, rather than what was medically recommended or necessary for the patient.

95.     On August 27, 2018, AIMA emailed Luzzi and Nocher providing "the personal cancers and diagnosis codes which will enable maximum reimbursement if the referring physician is selecting the Breast and Ovarian Panel."

96.     On September 6, 2018, Luzzi emailed AIMA asking AIMA to review a "comprehensive PGx panel," and to advise him "if we added these genes would it increase our reimbursement on Medicare? . . . Want to make sure we are not missing any money."

97.     An AIMA employee responded, writing: "I will get back to you after mapping these genes about the reimbursement scenario."

98.     On November 20, 2018, AIMA emailed Luzzi attaching sample CGx and PGx panels that were "getting really good reimbursement," from a lab located in a Novitas region. Novitas is a MAC that administered the Medicare program for a different geographic jurisdiction than First Coast during the relevant time period. AIMA also wrote in the email: "I have added a set of PGx genes which we can add to your existing panels."

99.     AIMA assisted Selecta in developing its genetic testing panels based on how lucrative each panel was, not based on what would be best for patients.

100.    The AIMA employees who supported CEO Aaron Liston in advising Selecta, and who advised Selecta on developing genetic testing panels, were not physicians, geneticists, genetic counselors, molecular biologists, or laboratory scientists. On the contrary, AIMA's employees generally provided administrative support.

101.    AIMA's employees were not just providing basic medical billing services, nor was their expertise in that area. Instead, AIMA's role was to maximize profits for Luzzi and Nocher. In turn, Luzzi and Nocher paid AIMA for its services.

102.    In addition to advising Selecta on its genetic testing panel, AIMA helped Luzzi and Nocher maximize profits in a variety of other ways. For example, in October 2018, Luzzi and a Selecta employee sought help from AIMA regarding a claim for genetic testing that was being audited by a company called Medical Audit and Review Solutions ("MARS"). Luzzi and the employee asked if AIMA could help with the negotiation of the claim in question, and AIMA responded that it could assist. Replying back to AIMA, Luzzi wrote on October 10, 2018: "Go get us MORE money! LOL."

**B. AIMA Knew Selecta's CGx and PGx Tests Were Not Medically Necessary but Billed Medicare Anyway**

103.    AIMA understood that genetic tests billed to Medicare needed to adhere to LCDs, the MAC's policy determination as to whether or not a particular item or service was covered by Medicare.

104.    AIMA referenced LCDs applicable to genetic testing in its discussions with Luzzi, Nocher, and Selecta, including in written communications. In these discussions, AIMA, Luzzi, and Nocher relied on the LCDs as a rulebook they were expected to follow if they wanted Medicare to pay for Selecta's genetic tests. AIMA also offered its interpretation of the LCDs and requirements for Medicare reimbursement.

105.    For example, AIMA relied on an LCD, First Coast LCD L36499 pertaining to BRCA1 and BRCA2 genetic testing (testing for genes associated with breast or ovarian cancer), in advising Luzzi, Nocher, and Selecta on requirements for that type of genetic testing. AIMA

referenced this LCD in writing to Luzzi, Nocher, and Selecta as early as August 7, 2018, with the understanding that the LCD stated requirements for billing for this type of genetic testing.

106.    First Coast LCD L36499 pertaining to BRCA1 and BRCA2 genetic testing specifically cited and quoted Title XVIII of the Social Security Act, section 1862(a)(1)(A), stating: "no Medicare payment shall be made for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury." LCD L36499 further stated, in the section titled "Non-Covered Indications," that BRCA1/BRCA2 genetic testing for susceptibility to breast or ovarian cancer was not covered if performed for "genetic screening in the general population" because "[s]uch testing is considered screening and is excluded by Medicare statute" and "is considered not medically reasonable and necessary."

107.    AIMA also relied on First Coast LCD L34912, pertaining to genetic testing for Lynch Syndrome (associated with colorectal cancer), in advising Luzzi, Nocher, and Selecta on requirements for that type of genetic testing. AIMA also referenced this LCD in writing to Luzzi, Nocher, and Selecta as early as August 7, 2018, with the understanding that the LCD stated requirements for billing for this type of genetic testing.

108.    First Coast LCD L34912 pertaining to genetic testing for Lynch Syndrome also cited and quoted Title XVIII of the Social Security Act, section 1862(a)(1)(A), stating: "no Medicare payment shall be made for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury."

109.    AIMA employees advising Luzzi, Nocher, and Selecta read the LCDs and understood them to contain requirements for billing Medicare. This included the requirement that the tests be medically necessary and not conducted merely for informational or screening purposes. Nevertheless, AIMA submitted or caused to be submitted genetic tests on behalf of Selecta that

AIMA knew or should have known were conducted merely for informational or screening purposes, not to treat or diagnose patients. The Medicare beneficiaries targeted by Selecta were solicited through nationwide telemarketing calls, were swabbed at home for their DNA, and a "telemedicine" doctor then signed an order for the genetic test to create the necessary paperwork for the patient's file. The beneficiaries were not being treated by their doctor.

110.    AIMA, Luzzi, and Selecta specifically discussed Medicare's medical necessity requirements for genetic testing, including the guidance for medical necessity contained in LCDs.

111.    AIMA had access to Selecta's business portal system, which AIMA accessed in order to review and approve doctors' orders for genetic testing, known as test "requisition" or "req" forms. AIMA also reviewed sham doctors' notes and letters written to support the alleged medical necessity of the genetic tests. The documents contained cut-and-paste and template language used for Medicare beneficiaries across the country that Selecta reached through telemarketing calls. They were used to paper the patient medical records. Even a brief review of the documents demonstrated that they did not reflect the use of genetic testing for genuine medical treatment or diagnoses. Nevertheless, AIMA reviewed the documentation, gave its approval to bill Medicare, and submitted the bills for the genetic testing.

112.    Indeed, Selecta's requisition forms, which AIMA read, listed the same address in Monarch Beach, California as the address for various doctors who ordered genetic tests from Selecta. Monarch Beach, California was the address for the "telemedicine" company that employed the doctors. These doctors ordered genetic tests for Medicare beneficiaries throughout the country – they did not have a treating relationship with the beneficiaries and generally were not located in the same state as the beneficiaries.

113.    On or about February 12, 2019, a Selecta employee emailed AIMA noting that

"patients are not being checked for both insurance and medical necessity. I noticed the majority of the comments under Pre Accession Notes are related to insurance verification but do not mention medical necessity. Can you please review to make sure the 79 requisitions under Acceptable for Testing have correct status?"

114.    On the same day, an AIMA employee replied to the email stating in pertinent part that they were "working on correcting this." A few minutes later, also on the same day, AIMA sent another email to Selecta stating: "I have checked and updated the correct status. Now, you can send the samples for processing." As discussed in the emails, AIMA was reviewing Selecta's samples for "medical necessity" and approving them.

115.    Months earlier, on or about August 16, 2018, a Selecta employee emailed AIMA with the subject: "Pending AIMA Screening." Selecta asked: ". . . what is the realistic turn around time for samples under the "Pending AIMA Screening" status. We have added patients for both CGX and PGX and we are holding the samples from being processed until we see the Acceptable or Rejected status. Thank you!" AIMA responded that their turnaround time for approval was 24 hours.

116.    As reflected in these emails, AIMA reviewed the patient documentation in Selecta's business portal and either approved or rejected the Medicare beneficiary for genetic testing with a 24-hour turnaround time. AIMA did not just review the patient documentation to verify the beneficiary's insurance – AIMA also reviewed it specifically to assess whether the medical necessity documentation was sufficient, in its view, to allow billing to proceed. Selecta relied on AIMA to help determine whether it could safely get away with billing Medicare for the genetic tests. AIMA, motivated by the desire to make money and please its client, reviewed requisition forms for Selecta and approved them for processing and billing.

117.    Although the patient records did not reflect that the genetic tests were truly medically necessary, AIMA approved the claims anyway and submitted them to Medicare for payment.

118.    AIMA was aware of Selecta's business model, which was to contact Medicare beneficiaries through telemarketing calls, ask beneficiaries a series of questions, obtain the beneficiaries' genetic sample, and then connect the beneficiaries to "telemedicine doctors" who would sign the requisitions (orders) for genetic testing. Selecta's business model was precisely to offer informational genetic tests that were not ordered by the patient's treating physician, were not for the purpose of treating or diagnosing an illness or injury, and were therefore not covered by Medicare.

119.    During these telemarketing calls, the marketers asked the Medicare beneficiaries a series of personal health questions, including questions about their cancer history, the cancer history of their family members, their mental and physical health, their medications, and their health diagnoses. If certain questions were answered in the affirmative, the marketers deemed the beneficiary "qualified" for a genetic test.

120.    If beneficiaries agreed to a genetic test and were considered "qualified," Luzzi, Nocher, and their business partners sent "notaries" or agents to Medicare beneficiaries' homes to collect the beneficiaries' genetic samples by means of cheek swabs.

121.    The notaries or agents who collected the cheek swabs were not medical professionals, nor were they working under the supervision of a medical professional.

122.    Since Medicare would not pay for the genetic tests without an order or requisition for lab testing from a medical provider, Luzzi, Nocher, and their business partners also paid "telemedicine" companies to provide them with doctors to sign the requisitions for the CGx and

PGx tests. These doctors did not have a treatment relationship with the beneficiaries, did not provide the beneficiaries with any treatment or diagnosis, did not use the test results in the treatment of the beneficiaries or management of an illness, did not conduct a proper telehealth visit, and did not interpret or even see the test results.

123.    Furthermore, Nocher, Luzzi, and their business partners sent notaries or agents to beneficiaries' homes to swab them for their DNA without first having an order for genetic testing signed by a doctor. Beneficiaries were swabbed without a doctor's order and with no medical supervision or direction, and arrangements were made for doctors to sign the requisition forms after-the-fact.

124.    The "telemedicine" doctors that signed Selecta requisition forms for genetic testing were assigned a batch of Medicare beneficiaries to go through in an electronic portal. They received patient history information taken down by call center telemarketing representatives. Along with the list of assigned Medicare beneficiaries, the doctors were given a phone number to contact each beneficiary. It is unclear whether the doctors always spoke with the beneficiaries via telephone. If they spoke to the beneficiaries, it was a phone call with no genuine medical evaluation, examination, management, or treatment. The doctors added their electronic signatures to the portal as instructed by the "telemedicine" company, Nocher, Luzzi, and their partners, thus signing the electronic patient notes and necessary requisition forms to bill Medicare.

125.    In or about September 2018, Luzzi and Nocher discussed with AIMA their method of collecting beneficiary genetic samples – namely, that they and their marketing partners collected genetic samples from patients first and later got the "telemedicine" doctors to sign the requisitions for the PGx and CGx tests.

126.    On September 26, 2018, Luzzi sent AIMA an email with a link to educational

materials from the CMS website regarding Medicare coverage for laboratory services. The subject of the email was "Telemed Collection."

127.    AIMA responded to Luzzi and Nocher on September 27, 2018, via email. The email was from AIMA employee Mark Goodman and cc'ed AIMA employee Scott Jones and AIMA CEO Aaron Liston. It stated:

> The below mentioned link doesn't say anywhere that sample can be collected before the physician visit, but it clearly says that medical necessity documentation when ordering for a laboratory test is essential and it has to be clearly mentioned in the progress notes or signed visit office note, this clearly means that a doctor has to screen the patient and the notes of the doctor should mention the necessity of the Laboratory test, [sic] **In that scenario if the sample was collected earlier and patient goes to a doctor [sic] gets the documents signed later [sic] is completely not logical and illegal.**
>
> **We can suggest 2 ways, i.e. the doctor notes should be on the sample collection date or the notes shouldn't consist of any date information when the doctor did the screening.**

(emphasis added).

| | |
|---|---|
| **From**: | Mark Goodman [mgoodman@aimabms.com] |
| **Sent**: | 9/27/2018 1:10:48 PM |
| **To**: | Rich Luzzi [rich.luzzi@selectalabs.com]; Jamie Nocher [jamie@pushstartllc.com] |
| **CC**: | Aaron Liston [aaron@aimabms.com]; Scott Jones [sjones@aimagroup.co.uk] |
| **Subject**: | Re: Telemed Collection |

Hi Rich/Jamie,

The below mentioned link doesn't say anywhere that sample can be collected before the physician visit, but it clearly says that medical necessity documentation when ordering for a laboratory test is essential and it has to be clearly mentioned in the progress notes or signed visit office note, this clearly means that a doctor has to screen the patient and the notes of the doctor should mention the necessity of the Laboratory test, In that scenario if the sample was collected earlier and patient goes to a doctor gets the documents signed later is completely not logical and illegal.

We can suggest 2 ways, i.e. the doctor notes should be on the sample collection date or the notes shouldn't consist of any date information when the doctor did the screening.

Thanks & Regards
Mark Goodman | Manager - Lab RCS | Aima BMS
Email: mgoodman@aimabms.com
Ph: (941) 313-7153



128.    Luzzi, Nocher, and AIMA discussed the fact that Selecta's "telemedicine" doctors would sign the orders for genetic testing **after** Selecta's marketing partners had already collected the beneficiary's genetic sample. AIMA acknowledged that collecting the genetic samples without the direction of a physician or health care professional and signing the medical documentation after-the-fact was "completely not logical and illegal" because it showed that the tests were not medically necessary. Nevertheless, AIMA offered Luzzi and Nocher two ways they could falsify and manipulate medical records to hide the fraud. AIMA did not advise Luzzi and Nocher to find a new business model that complied with the law or to stop billing Medicare for genetic tests – nor did AIMA refuse to process the fraudulent genetic tests.

129.    Not only did AIMA know Selecta's CGx and PGx tests were not medically necessary and not ordered by a treating physician to treat or diagnose a patient, but AIMA also

advised Selecta how to falsify and manipulate documentation so that fraudulent genetic tests would go undetected if Selecta's medical records were ever audited.

130.    After the September 27, 2018, email warning Selecta that its business practices were illegal, AIMA continued submitting claims to Medicare on behalf of Selecta for genetic testing.

### C. AIMA Knew Selecta's Medicare Claims for CGx and PGx Testing Were Repeatedly Rejected or Denied but Kept Billing Medicare Anyway

131.    AIMA also knew that Medicare was repeatedly denying or rejecting Selecta's claims for CGx and PGx testing reimbursement for various reasons, including for lack of medical necessity. Selecta and AIMA's billing practice was to keep pushing claims through to Medicare, modifying them if necessary until they got approved, without regard to accuracy or legitimacy of the claims.

132.    Out of 5,620 claims submitted on behalf of Selecta for genetic testing from August 22, 2018, through August 13, 2019, 2,244 claims were rejected, 2,112 were denied, and only 1,264 were paid.

133.    On January 28, 2019, First Coast sent a letter to Selecta with the subject: "RE: Benefits Integrity Review Results." The letter stated that Selecta had been placed on a "pre-payment benefit integrity review" and explained: "[t]he purpose of the medical record review is to ensure the services you billed to Medicare were medically necessary, covered, documented in the medical record, and to provide education as needed." First Coast further explained that it had performed a medical review, or audit, on a sample of claims billed to Medicare over a five-month period. The claims were for 409 services provided to thirty beneficiaries.

134.    After conducting the medical review or audit, First Coast denied all 409 services

for the thirty beneficiaries, a 100% denial rate.

135.    In the January 28, 2019, letter, First Coast explained its "notable findings" and Medicare requirements for billing genetic testing codes at issue in the Benefits Integrity Review. Among the "notable findings" was that "[t]he medical records received did not support that the billed services were expected to influence treatment of the condition toward which the testing was directed." First Coast also specifically noted the requirement that: "Results of the testing must directly impact treatment or management of the beneficiary." First Coast also referenced applicable LCDs, which explained requirements for billing Medicare for the genetic tests, including the medical necessity requirements.

136.    On February 5, 2019, after receiving the letter from First Coast, a Selecta employee (who regularly communicated with AIMA on behalf of Luzzi and Nocher) emailed AIMA employees Mark Goodman and Scott Jones, as well as CEO Aaron Liston, cc'ing Luzzi. The subject of the email referenced the "Benefits Integrity Review Results," the same subject as the First Coast letter dated January 28, 2019. The Selecta employee informed AIMA: "I added a letter we just received from CMS regarding a medical review to the google drive. Please review."

137.    AIMA assisted Luzzi and Nocher in addressing the medical review. Luzzi and Nocher compiled medical records to submit to First Coast, prepared to appeal the Medicare denials, and AIMA continued to provide assistance with billing and appeals.

138.    AIMA's assistance to Selecta included reviewing and uploading medical records to support fraudulent claims that had been denied by Medicare/First Coast.

139.    Rather than abandoning the genetic testing scheme or ensuring compliant practices, AIMA and Selecta kept billing Medicare for genetic tests using the same telemarketing and sham

telemedicine business model, making no effort to ensure the genetic tests were ordered by a treating physician for the purpose of treating or diagnosing a condition or illness.

140.     Selecta and AIMA kept billing Medicare for fraudulent genetic tests for months, up to and including August of 2019, even after receiving the January 28, 2019, Benefits Integrity Review letter from First Coast.

141.     On or about March 15, 2019, Luzzi emailed AIMA, including Aaron Liston, stating: "I have been speaking with Aaron about purchasing or partnering with a lab in Novitas while we get through this audit." Besides First Coast, Novitas was another Medicare jurisdiction where a lab stood to profit by billing for genetic testing. Since Selecta was in the process of being audited by First Coast, Luzzi and AIMA's response was to explore billing for genetic tests in a different Medicare region that might continue paying for the fraudulent genetic tests.

142.     Their response was not to change their business practices, but to explore ways to keep billing for fraudulent genetic tests in a different Medicare jurisdiction where the claims might get paid. Luzzi specifically considered whether Novitas might also audit Selecta's Medicare claims and discussed this possibility with AIMA.

### D. AIMA's Conduct Was Material

143.     As a condition of payment by Medicare for laboratory testing, the testing performed must be medically necessary, used for the diagnosis or treatment of the beneficiary, and must be ordered by a beneficiary's treating physician.

144.     AIMA knew these requirements to participate in Medicare, including medical necessity requirements, which are outlined in LCDs, statutes, and regulations.

145.     AIMA was aware that payment by Medicare was conditioned upon adhering to all medical necessity requirements, and that medical necessity was material to reimbursement. Indeed,

AIMA was hired by Selecta in large part to advise Selecta on such Medicare billing requirements.

146.    Medicare has exercised its authority to suspend providers under investigation for fraud and abuse, including suspending providers who bill for medically unnecessary services.

147.    Medicare was unaware of the fraudulent scheme to bill medically unnecessary genetic tests through Selecta at the time of the conduct in 2018 and 2019. Nevertheless, Medicare, with the help of its contractor First Coast, identified many of the fraudulent and medically unnecessary claims as not payable and immediately denied payment. Out of 5,620 claims submitted on behalf of Selecta for genetic testing from August 22, 2018, through August 13, 2019, 2,244 claims were rejected, 2,112 were denied, and only 1,264 were paid.

148.    Because the Medicare program largely relies on providers, suppliers, and billers to submit proper claims for reimbursement and cannot identify all fraud before claims are paid, Medicare paid for some of the fraudulent genetic testing claims that AIMA submitted on behalf of Selecta.[2]

149.    For some fraudulent genetic testing claims, Medicare identified through an audit or "benefit integrity review" that genetic tests were being billed by Selecta with a 100% error rate. Medicare notified Selecta of the benefit integrity review and that medical necessity was a condition of payment. It also denied payments to Selecta as a result of the benefit integrity review, which found that Selecta's claims were not supported as being medically necessary. Medicare prevented

---

[2] It is not feasible for the Medicare program or its contractors to review medical records corresponding to each of the millions of claims for payment it receives from providers. Generally, once a provider, supplier, or biller submits a claim, the claim is paid directly to the provider/supplier, relying on the truthfulness of the claim, without any review of supporting documentation, including medical records. Some claims, however, can be immediately identified as not payable without the need for a medical records review, and others are identified as not payable through audits or prepayment reviews.

further damages to the government through the benefit integrity review process, and Selecta eventually stopped billing Medicare for genetic tests once it realized that the business could not continue to operate as planned.

### III.  The United States Suffered Damages

150.    Medicare paid Selecta approximately $2,657,468 million under Medicare Part B for medically unnecessary CGx and PGx tests submitted between August 22, 2018, and August 13, 2019.

151.    In turn, Selecta paid AIMA for providing billing services and guidance so that Selecta could continue billing Medicare.

152.    In this time period, 5,620 claims were submitted to Medicare Part B on behalf of Selecta for genetic testing.

153.    Selecta, using AIMA as its billing company, billed not only traditional Medicare, or Medicare Part B, but also Part C "Medicare Advantage" ("MA") managed care plans. Both Medicare Part B and Part C managed care plans paid for fraudulent genetic testing claims AIMA submitted on behalf of Selecta using the same telemarketing and sham telemedicine practices.

### IV.   Representative Claims[3]

154.    As demonstrated in the chart below, claims for genetic tests were submitted to Medicare on behalf of Selecta for beneficiary KB on December 10, 2018, and Medicare paid for those claims on December 26, 2018. Claims for genetic tests were again submitted to Medicare on

---

[3] These sample Medicare Part B claims accurately demonstrate amounts billed on behalf of Selecta and paid by Medicare for the beneficiaries indicated. However, in some instances, additional claim lines were billed for these beneficiaries where Medicare paid zero dollars, and not all such instances are detailed in this summary.

behalf of Selecta for beneficiary KB on December 19, 2018, and Medicare paid for those claims on January 15, 2019. The list of genetic tests ordered for beneficiary KB is below. The total amount Medicare paid for KB's genetic tests was $ 6,229.98. KB resided in the state of Maine, but KB's genetic tests were ordered by Dr. Walter Nickel, who practiced in North Carolina. Dr. Nickel did not have a treatment relationship with KB.

| Beneficiary Initials | Claim Submission Date | Claim Paid Date | Procedure Code | Genetic Testing Description | Amt Billed | Amt Paid To Provider |
|---|---|---|---|---|---|---|
| K.B. | 12/10/2018 | 12/26/2018 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $295.00 | $285.53 |
| K.B. | 12/10/2018 | 12/26/2018 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $455.00 | $441.89 |
| K.B. | 12/10/2018 | 12/26/2018 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $175.00 | $0.00 |
| K.B. | 12/10/2018 | 12/26/2018 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $175.00 | $0.00 |
| K.B. | 12/10/2018 | 12/26/2018 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $175.00 | $0.00 |
| K.B. | 12/10/2018 | 12/26/2018 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $70.00 | $64.38 |
| K.B. | 12/10/2018 | 12/26/2018 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $80.00 | $73.93 |
| K.B. | 12/10/2018 | 12/26/2018 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $70.00 | $64.03 |
| K.B. | 12/10/2018 | 12/26/2018 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $175.00 | $0.00 |
| K.B. | 12/10/2018 | 12/26/2018 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $90.00 | $0.00 |
| K.B. | 12/10/2018 | 12/26/2018 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $140.00 | $134.26 |
| K.B. | 12/10/2018 | 12/17/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $375.00 | $0.00 |
| K.B. | 12/19/2018 | 01/15/2019 | 81201 | GENE ANALYSIS (ADENOMATOUS POLYPOSIS COLI), FULL GENE SEQUENCE | $785.00 | $0.00 |
| K.B. | 12/19/2018 | 01/15/2019 | 81317 | GENE ANALYSIS (POSTMEIOTIC SEGREGATION INCREASED 2 [S CEREVISIAE]) FULL SEQUENCE ANALYSIS | $710.00 | $692.88 |
| K.B. | 12/19/2018 | 01/15/2019 | 81404 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 5 GENETIC ANALYSIS | $840.00 | $538.66 |
| K.B. | 12/19/2018 | 01/15/2019 | 81405 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 6 GENETIC ANALYSIS | $610.00 | $590.64 |
| K.B. | 12/19/2018 | 01/15/2019 | 81406 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 7 GENETIC ANALYSIS | $570.00 | $554.44 |
| K.B. | 12/19/2018 | 01/15/2019 | 81407 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 8 GENETIC ANALYSIS | $850.00 | $829.34 |

| K.B. | 12/19/2018 | 01/15/2019 | 81408 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 9 GENETIC ANALYSIS | $2,010.00 | $1,960.00 |
| K.B. | 12/19/2018 | 01/15/2019 | 81432 | TEST FOR DETECTING GENES ASSOCIATED WITH INHERITED BREAST CANCER-RELATED DISORDERS, GENOMIC SEQUENCE ANALYSIS, AT LEAST 5 GENES | $850.00 | $0.00 |
| K.B. | 12/19/2018 | 01/10/2019 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $950.00 | $0.00 |

155.    As demonstrated in the chart below, claims for genetic tests were submitted to Medicare on behalf of Selecta for beneficiary EP on October 26, 2018, and Medicare paid for those claims on November 9, 2018. Claims for genetic tests were again submitted to Medicare on behalf of Selecta for beneficiary EP on November 21, 2018, and Medicare paid for those claims on December 17, 2018. Although claims for genetic tests were submitted to Medicare on behalf of Selecta for beneficiary EP on November 13, 2018, Medicare declined to pay for those claims. The list of genetic tests ordered for beneficiary EP is below. The total amount Medicare paid for EP's genetic tests was $ 5,987.52. EP also resided in the state of Maine, but EP's genetic tests were ordered by Dr. Troy Williams, who practiced in California. Dr. Williams did not have a treatment relationship with EP.

| Beneficiary Initials | Claim Submission Date | Claim Paid Date | Procedure Code | Genetic Testing Description | Amt Billed | Amt Paid To Provider |
|---|---|---|---|---|---|---|
| E.P. | 10/26/2018 | 11/09/2018 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $295.00 | $285.53 |
| E.P. | 10/26/2018 | 11/09/2018 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $455.00 | $0.00 |
| E.P. | 10/26/2018 | 11/09/2018 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $175.00 | $0.00 |
| E.P. | 10/26/2018 | 11/09/2018 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $175.00 | $0.00 |
| E.P. | 10/26/2018 | 11/09/2018 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $175.00 | $0.00 |
| E.P. | 10/26/2018 | 11/09/2018 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $70.00 | $64.38 |
| E.P. | 10/26/2018 | 11/09/2018 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $80.00 | $73.93 |
| E.P. | 10/26/2018 | 11/09/2018 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $70.00 | $64.03 |

| E.P. | 10/26/2018 | 11/09/2018 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $175.00 | $0.00 |
|---|---|---|---|---|---|---|
| E.P. | 10/26/2018 | 11/09/2018 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $90.00 | $0.00 |
| E.P. | 10/26/2018 | 11/09/2018 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $140.00 | $134.26 |
| E.P. | 10/26/2018 | 11/02/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $625.00 | $0.00 |
| E.P. | 11/13/2018 | 11/20/2018 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $295.00 | $0.00 |
| E.P. | 11/13/2018 | 11/20/2018 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $455.00 | $0.00 |
| E.P. | 11/13/2018 | 11/20/2018 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $175.00 | $0.00 |
| E.P. | 11/13/2018 | 11/20/2018 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $175.00 | $0.00 |
| E.P. | 11/13/2018 | 11/20/2018 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $175.00 | $0.00 |
| E.P. | 11/13/2018 | 11/20/2018 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $70.00 | $0.00 |
| E.P. | 11/13/2018 | 11/20/2018 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $80.00 | $0.00 |
| E.P. | 11/13/2018 | 11/20/2018 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $70.00 | $0.00 |
| E.P. | 11/13/2018 | 11/20/2018 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $175.00 | $0.00 |
| E.P. | 11/13/2018 | 11/20/2018 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $90.00 | $0.00 |
| E.P. | 11/13/2018 | 11/20/2018 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $140.00 | $0.00 |
| E.P. | 11/13/2018 | 11/16/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $625.00 | $0.00 |
| E.P. | 11/21/2018 | 12/17/2018 | 81201 | GENE ANALYSIS (ADENOMATOUS POLYPOSIS COLI), FULL GENE SEQUENCE | $785.00 | $0.00 |
| E.P. | 11/21/2018 | 12/17/2018 | 81317 | GENE ANALYSIS (POSTMEIOTIC SEGREGATION INCREASED 2 [S CEREVISIAE]) FULL SEQUENCE ANALYSIS | $710.00 | $692.88 |
| E.P. | 11/21/2018 | 12/17/2018 | 81404 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 5 GENETIC ANALYSIS | $840.00 | $538.66 |
| E.P. | 11/21/2018 | 12/17/2018 | 81405 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 6 GENETIC ANALYSIS | $610.00 | $590.64 |
| E.P. | 11/21/2018 | 12/17/2018 | 81406 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 7 GENETIC ANALYSIS | $570.00 | $554.44 |
| E.P. | 11/21/2018 | 12/17/2018 | 81407 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 8 GENETIC ANALYSIS | $850.00 | $829.34 |
| E.P. | 11/21/2018 | 12/17/2018 | 81408 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 9 GENETIC ANALYSIS | $2,010.00 | $1,960.00 |
| E.P. | 11/21/2018 | 12/17/2018 | 81432 | TEST FOR DETECTING GENES ASSOCIATED WITH INHERITED BREAST CANCER-RELATED DISORDERS, GENOMIC SEQUENCE ANALYSIS, AT LEAST 5 GENES | $850.00 | $199.43 |
| E.P. | 11/21/2018 | 12/12/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $950.00 | $0.00 |
| E.P. | 11/21/2018 | 11/29/2018 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $295.00 | $0.00 |
| E.P. | 11/21/2018 | 11/29/2018 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $455.00 | $0.00 |
| E.P. | 11/21/2018 | 11/29/2018 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $175.00 | $0.00 |

| E.P. | 11/21/2018 | 11/29/2018 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $175.00 | $0.00 |
| E.P. | 11/21/2018 | 11/29/2018 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $175.00 | $0.00 |
| E.P. | 11/21/2018 | 11/29/2018 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $70.00 | $0.00 |
| E.P. | 11/21/2018 | 11/29/2018 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $80.00 | $0.00 |
| E.P. | 11/21/2018 | 11/29/2018 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $70.00 | $0.00 |
| E.P. | 11/21/2018 | 11/29/2018 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $175.00 | $0.00 |
| E.P. | 11/21/2018 | 11/29/2018 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $90.00 | $0.00 |
| E.P. | 11/21/2018 | 11/29/2018 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $140.00 | $0.00 |
| E.P. | 11/21/2018 | 11/27/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $625.00 | $0.00 |

156.    As demonstrated in the chart below, claims for genetic tests were submitted to Medicare on behalf of Selecta for beneficiary JH on November 15, 2018, and Medicare paid for those claims on December 11, 2018. Claims for genetic tests were again submitted to Medicare on behalf of Selecta for beneficiary JH on December 27, 2018, and Medicare paid for those claims on January 10, 2019. Although claims for genetic tests were submitted to Medicare on behalf of Selecta for beneficiary JH on September 17, 2018, and on December 13, 2018, Medicare declined to pay for those claims. The list of genetic tests ordered for beneficiary JH is below. The total amount Medicare paid for JH's genetic tests was $ 7,051.54, although the amount billed on behalf of Selecta was $ 15,651. JH resided in the state of Tennessee, but JH's genetic tests were ordered by Dr. Leslie Ballard, who practiced in California. Dr. Ballard did not have a treatment relationship with JH.

| Beneficiary Initials | Claim Submission Date | Claim Paid Date | Procedure Code | Genetic Testing Description | Amt Billed | Amt Paid To Provider |
|---|---|---|---|---|---|---|
| J.H. | 11/15/2018 | 12/11/2018 | 81201 | GENE ANALYSIS (ADENOMATOUS POLYPOSIS COLI), FULL GENE SEQUENCE | $785.00 | $0.00 |
| J.H. | 11/15/2018 | 12/11/2018 | 81317 | GENE ANALYSIS (POSTMEIOTIC SEGREGATION INCREASED 2 [S CEREVISIAE]) FULL SEQUENCE ANALYSIS | $710.00 | $692.88 |
| J.H. | 11/15/2018 | 12/11/2018 | 81404 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 5 GENETIC ANALYSIS | $840.00 | $538.66 |

| | | | | | | |
|---|---|---|---|---|---|---|
| J.H. | 11/15/2018 | 12/11/2018 | 81405 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 6 GENETIC ANALYSIS | $610.00 | $590.64 |
| J.H. | 11/15/2018 | 12/11/2018 | 81406 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 7 GENETIC ANALYSIS | $570.00 | $554.44 |
| J.H. | 11/15/2018 | 12/11/2018 | 81407 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 8 GENETIC ANALYSIS | $850.00 | $829.34 |
| J.H. | 11/15/2018 | 12/11/2018 | 81408 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 9 GENETIC ANALYSIS | $2,010.00 | $1,960.00 |
| J.H. | 11/15/2018 | 12/11/2018 | 81432 | TEST FOR DETECTING GENES ASSOCIATED WITH INHERITED BREAST CANCER-RELATED DISORDERS, GENOMIC SEQUENCE ANALYSIS, AT LEAST 5 GENES | $850.00 | $821.56 |
| J.H. | 11/15/2018 | 12/07/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $950.00 | $0.00 |
| J.H. | 12/13/2018 | 12/20/2018 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $292.00 | $0.00 |
| J.H. | 12/13/2018 | 12/20/2018 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $451.00 | $0.00 |
| J.H. | 12/13/2018 | 12/20/2018 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $175.00 | $0.00 |
| J.H. | 12/13/2018 | 12/20/2018 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $175.00 | $0.00 |
| J.H. | 12/13/2018 | 12/20/2018 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $175.00 | $0.00 |
| J.H. | 12/13/2018 | 12/20/2018 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $66.00 | $0.00 |
| J.H. | 12/13/2018 | 12/20/2018 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $76.00 | $0.00 |
| J.H. | 12/13/2018 | 12/20/2018 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $66.00 | $0.00 |
| J.H. | 12/13/2018 | 12/20/2018 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $175.00 | $0.00 |
| J.H. | 12/13/2018 | 12/20/2018 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $89.00 | $0.00 |
| J.H. | 12/13/2018 | 12/20/2018 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $137.00 | $0.00 |
| J.H. | 12/13/2018 | 12/18/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $615.00 | $0.00 |
| J.H. | 12/27/2018 | 01/10/2019 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $292.00 | $285.53 |
| J.H. | 12/27/2018 | 01/10/2019 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $451.00 | $441.89 |
| J.H. | 12/27/2018 | 01/10/2019 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $175.00 | $0.00 |
| J.H. | 12/27/2018 | 01/10/2019 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $175.00 | $0.00 |
| J.H. | 12/27/2018 | 01/10/2019 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $175.00 | $0.00 |
| J.H. | 12/27/2018 | 01/10/2019 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $66.00 | $64.38 |
| J.H. | 12/27/2018 | 01/10/2019 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $76.00 | $73.93 |
| J.H. | 12/27/2018 | 01/10/2019 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $66.00 | $64.03 |
| J.H. | 12/27/2018 | 01/10/2019 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $175.00 | $0.00 |

39

| J.H. | 12/27/2018 | 01/10/2019 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $89.00 | $0.00 |
|------|------------|------------|-------|---------------------------------------------------------------------------------|--------|-------|
| J.H. | 12/27/2018 | 01/10/2019 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $137.00 | $134.26 |
| J.H. | 12/27/2018 | 01/04/2019 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $615.00 | $0.00 |
| J.H. | 09/17/2018 | 09/24/2018 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $292.00 | $0.00 |
| J.H. | 09/17/2018 | 09/24/2018 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $451.00 | $0.00 |
| J.H. | 09/17/2018 | 09/24/2018 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $175.00 | $0.00 |
| J.H. | 09/17/2018 | 09/24/2018 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $175.00 | $0.00 |
| J.H. | 09/17/2018 | 09/24/2018 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $175.00 | $0.00 |
| J.H. | 09/17/2018 | 09/24/2018 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $66.00 | $0.00 |
| J.H. | 09/17/2018 | 09/24/2018 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $76.00 | $0.00 |
| J.H. | 09/17/2018 | 09/24/2018 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $66.00 | $0.00 |
| J.H. | 09/17/2018 | 09/24/2018 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $175.00 | $0.00 |
| J.H. | 09/17/2018 | 09/24/2018 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $89.00 | $0.00 |
| J.H. | 09/17/2018 | 09/24/2018 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $137.00 | $0.00 |
| J.H. | 09/17/2018 | 09/20/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $615.00 | $0.00 |

157.    As demonstrated in the chart below, claims for genetic tests were submitted to Medicare on behalf of Selecta for beneficiary CT on November 26, 2018, and Medicare paid for those claims on December 21, 2018. Claims for genetic tests were again submitted to Medicare on behalf of Selecta for beneficiary CT on December 20, 2018, and Medicare paid for those claims on January 4, 2019. Claims for genetic tests were also submitted to Medicare on behalf of Selecta for beneficiary CT on November 13 and 21, 2018, and December 14, 2018, but Medicare declined to pay for those claims. The list of genetic tests ordered for beneficiary CT is below. The total amount Medicare paid for CT's genetic tests was $ 6,358.66, although the amount billed on behalf of Selecta was $ 15,750. CT resided in the state of North Carolina, but CT's genetic tests were

40

ordered by Dr. Connor Chase, who practiced in Texas. Dr. Chase did not have a treatment relationship with CT.

| Beneficiary Initials | Claim Submission Date | Claim Paid Date | Procedure Code | Genetic Testing Description | Amt Billed | Amt Paid To Provider |
|---|---|---|---|---|---|---|
| C.T. | 11/26/2018 | 12/21/2018 | 81201 | GENE ANALYSIS (ADENOMATOUS POLYPOSIS COLI), FULL GENE SEQUENCE | $785.00 | $0.00 |
| C.T. | 11/26/2018 | 12/21/2018 | 81317 | GENE ANALYSIS (POSTMEIOTIC SEGREGATION INCREASED 2 [S CEREVISIAE]) FULL SEQUENCE ANALYSIS | $710.00 | $0.00 |
| C.T. | 11/26/2018 | 12/21/2018 | 81404 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 5 GENETIC ANALYSIS | $840.00 | $538.66 |
| C.T. | 11/26/2018 | 12/21/2018 | 81405 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 6 GENETIC ANALYSIS | $610.00 | $590.64 |
| C.T. | 11/26/2018 | 12/21/2018 | 81406 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 7 GENETIC ANALYSIS | $570.00 | $554.44 |
| C.T. | 11/26/2018 | 12/21/2018 | 81407 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 8 GENETIC ANALYSIS | $850.00 | $829.34 |
| C.T. | 11/26/2018 | 12/21/2018 | 81408 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 9 GENETIC ANALYSIS | $2,010.00 | $1,960.00 |
| C.T. | 11/26/2018 | 12/21/2018 | 81432 | TEST FOR DETECTING GENES ASSOCIATED WITH INHERITED BREAST CANCER-RELATED DISORDERS, GENOMIC SEQUENCE ANALYSIS, AT LEAST 5 GENES | $850.00 | $821.56 |
| C.T. | 11/26/2018 | 12/18/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $950.00 | $0.00 |
| C.T. | 12/20/2018 | 01/04/2019 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $295.00 | $285.53 |
| C.T. | 12/20/2018 | 01/04/2019 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $455.00 | $441.89 |
| C.T. | 12/20/2018 | 01/04/2019 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $175.00 | $0.00 |
| C.T. | 12/20/2018 | 01/04/2019 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $175.00 | $0.00 |
| C.T. | 12/20/2018 | 01/04/2019 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $175.00 | $0.00 |
| C.T. | 12/20/2018 | 01/04/2019 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $70.00 | $64.38 |
| C.T. | 12/20/2018 | 01/04/2019 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $80.00 | $73.93 |
| C.T. | 12/20/2018 | 01/04/2019 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $70.00 | $64.03 |
| C.T. | 12/20/2018 | 01/04/2019 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $175.00 | $0.00 |
| C.T. | 12/20/2018 | 01/04/2019 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $90.00 | $0.00 |
| C.T. | 12/20/2018 | 01/04/2019 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $140.00 | $134.26 |
| C.T. | 12/20/2018 | 12/31/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $625.00 | $0.00 |
| C.T. | 11/13/2018 | 11/20/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $625.00 | $0.00 |
| C.T. | 11/21/2018 | 11/29/2018 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $295.00 | $0.00 |

| C.T. | 11/21/2018 | 11/29/2018 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $455.00 | $0.00 |
|------|-----------|-----------|-------|-----------------------------------------------------------------------------------|---------|-------|
| C.T. | 11/21/2018 | 11/29/2018 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $175.00 | $0.00 |
| C.T. | 11/21/2018 | 11/29/2018 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $175.00 | $0.00 |
| C.T. | 11/21/2018 | 11/29/2018 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $175.00 | $0.00 |
| C.T. | 11/21/2018 | 11/29/2018 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $70.00 | $0.00 |
| C.T. | 11/21/2018 | 11/29/2018 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $80.00 | $0.00 |
| C.T. | 11/21/2018 | 11/29/2018 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $70.00 | $0.00 |
| C.T. | 11/21/2018 | 11/29/2018 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $175.00 | $0.00 |
| C.T. | 11/21/2018 | 11/29/2018 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $90.00 | $0.00 |
| C.T. | 11/21/2018 | 11/29/2018 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $140.00 | $0.00 |
| C.T. | 11/21/2018 | 11/27/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $625.00 | $0.00 |
| C.T. | 12/14/2018 | 12/21/2018 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $295.00 | $0.00 |
| C.T. | 12/14/2018 | 12/21/2018 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $455.00 | $0.00 |
| C.T. | 12/14/2018 | 12/21/2018 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $175.00 | $0.00 |
| C.T. | 12/14/2018 | 12/21/2018 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $175.00 | $0.00 |
| C.T. | 12/14/2018 | 12/21/2018 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $175.00 | $0.00 |
| C.T. | 12/14/2018 | 12/21/2018 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $70.00 | $0.00 |
| C.T. | 12/14/2018 | 12/21/2018 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $80.00 | $0.00 |
| C.T. | 12/14/2018 | 12/21/2018 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $70.00 | $0.00 |
| C.T. | 12/14/2018 | 12/21/2018 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $175.00 | $0.00 |
| C.T. | 12/14/2018 | 12/21/2018 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $90.00 | $0.00 |
| C.T. | 12/14/2018 | 12/21/2018 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $140.00 | $0.00 |

158.    As demonstrated in the chart below, claims for genetic tests were submitted to Medicare on behalf of Selecta for beneficiary JB on November 28, 2018, and Medicare paid for

those claims on December 31, 2018. Claims for genetic tests were again submitted to Medicare on behalf of Selecta for beneficiary JB on December 28, 2018, and Medicare paid for those claims on January 24, 2019. Claims for genetic tests were also submitted to Medicare on behalf of Selecta for beneficiary JB on November 19 and December 19, 2018, but Medicare declined to pay for those claims. The list of genetic tests ordered for beneficiary JB is below. The total amount Medicare paid for JB's genetic tests on those dates was $ 6,358.66, although the amount billed on behalf of Selecta was $ 13,225. JB resided in the state of Missouri, but JB's genetic tests were ordered by Dr. Leslie Ballard, who practiced in California. Dr. Ballard did not have a treatment relationship with JB.

| Beneficiary Initials | Claim Submission Date | Claim Paid Date | Procedure Code | Genetic Testing Description | Amt Billed | Amt Paid To Provider |
|---|---|---|---|---|---|---|
| J.B. | 11/28/2018 | 12/31/2018 | 81201 | GENE ANALYSIS (ADENOMATOUS POLYPOSIS COLI), FULL GENE SEQUENCE | $785.00 | $0.00 |
| J.B. | 11/28/2018 | 12/31/2018 | 81317 | GENE ANALYSIS (POSTMEIOTIC SEGREGATION INCREASED 2 [S CEREVISIAE]) FULL SEQUENCE ANALYSIS | $710.00 | $0.00 |
| J.B. | 11/28/2018 | 12/31/2018 | 81404 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 5 GENETIC ANALYSIS | $840.00 | $538.66 |
| J.B. | 11/28/2018 | 12/31/2018 | 81405 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 6 GENETIC ANALYSIS | $610.00 | $590.64 |
| J.B. | 11/28/2018 | 12/31/2018 | 81406 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 7 GENETIC ANALYSIS | $570.00 | $554.44 |
| J.B. | 11/28/2018 | 12/31/2018 | 81407 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 8 GENETIC ANALYSIS | $850.00 | $829.34 |
| J.B. | 11/28/2018 | 12/31/2018 | 81408 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 9 GENETIC ANALYSIS | $2,010.00 | $1,960.00 |
| J.B. | 11/28/2018 | 12/31/2018 | 81432 | TEST FOR DETECTING GENES ASSOCIATED WITH INHERITED BREAST CANCER-RELATED DISORDERS, GENOMIC SEQUENCE ANALYSIS, AT LEAST 5 GENES | $850.00 | $821.56 |
| J.B. | 11/28/2018 | 12/21/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $950.00 | $0.00 |
| J.B. | 12/28/2018 | 01/24/2019 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $295.00 | $285.53 |
| J.B. | 12/28/2018 | 01/24/2019 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $455.00 | $441.89 |
| J.B. | 12/28/2018 | 01/24/2019 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $175.00 | $0.00 |
| J.B. | 12/28/2018 | 01/24/2019 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $175.00 | $0.00 |
| J.B. | 12/28/2018 | 01/24/2019 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $175.00 | $0.00 |
| J.B. | 12/28/2018 | 01/24/2019 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $70.00 | $64.38 |

| J.B. | 12/28/2018 | 01/24/2019 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $80.00 | $73.93 |
|------|------------|------------|-------|------|--------|--------|
| J.B. | 12/28/2018 | 01/24/2019 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $70.00 | $64.03 |
| J.B. | 12/28/2018 | 01/24/2019 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $175.00 | $0.00 |
| J.B. | 12/28/2018 | 01/24/2019 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $90.00 | $0.00 |
| J.B. | 12/28/2018 | 01/24/2019 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $140.00 | $134.26 |
| J.B. | 12/28/2018 | 01/04/2019 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $625.00 | $0.00 |
| J.B. | 11/19/2018 | 11/27/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $625.00 | $0.00 |
| J.B. | 12/19/2018 | 12/31/2018 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $295.00 | $0.00 |
| J.B. | 12/19/2018 | 12/31/2018 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $455.00 | $0.00 |
| J.B. | 12/19/2018 | 12/31/2018 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $175.00 | $0.00 |
| J.B. | 12/19/2018 | 12/31/2018 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $175.00 | $0.00 |
| J.B. | 12/19/2018 | 12/31/2018 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $175.00 | $0.00 |
| J.B. | 12/19/2018 | 12/31/2018 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $70.00 | $0.00 |
| J.B. | 12/19/2018 | 12/31/2018 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $80.00 | $0.00 |
| J.B. | 12/19/2018 | 12/31/2018 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $70.00 | $0.00 |
| J.B. | 12/19/2018 | 12/31/2018 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $175.00 | $0.00 |
| J.B. | 12/19/2018 | 12/31/2018 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $90.00 | $0.00 |
| J.B. | 12/19/2018 | 12/31/2018 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $140.00 | $0.00 |

159.    As demonstrated in the chart below, claims for genetic tests were submitted to Medicare on behalf of Selecta for beneficiary AF on November 13, 2018, and Medicare paid for those claims on November 27, 2018. Claims for genetic tests were again submitted to Medicare on behalf of Selecta for beneficiary AF on November 28, 2018, and Medicare paid for those claims on December 21, 2018. Claims for genetic tests were also submitted to Medicare on behalf of Selecta for beneficiary AF on November 26, 2018, but Medicare declined to pay for those claims.

The list of genetic tests ordered for beneficiary AF is below. The total amount Medicare paid for AF's genetic tests was $ 5,916.77, although the amount billed on behalf of Selecta was $ 13,225. AF resided in the state of Georgia, but AF's genetic tests were ordered by Dr. Walter Nickel, who practiced in North Carolina. Dr. Ballard did not have a treatment relationship with CG.

| Beneficiary Initials | Claim Submission Date | Claim Paid Date | Procedure Code | Genetic Testing Description | Amt Billed | Amt Paid To Provider |
|---|---|---|---|---|---|---|
| A.F. | 11/26/2018 | 12/03/2018 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $295.00 | $0.00 |
| A.F. | 11/26/2018 | 12/03/2018 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $455.00 | $0.00 |
| A.F. | 11/26/2018 | 12/03/2018 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $175.00 | $0.00 |
| A.F. | 11/26/2018 | 12/03/2018 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $175.00 | $0.00 |
| A.F. | 11/26/2018 | 12/03/2018 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $175.00 | $0.00 |
| A.F. | 11/26/2018 | 12/03/2018 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $70.00 | $0.00 |
| A.F. | 11/26/2018 | 12/03/2018 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $80.00 | $0.00 |
| A.F. | 11/26/2018 | 12/03/2018 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $70.00 | $0.00 |
| A.F. | 11/26/2018 | 12/03/2018 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $175.00 | $0.00 |
| A.F. | 11/26/2018 | 12/03/2018 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $90.00 | $0.00 |
| A.F. | 11/26/2018 | 12/03/2018 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $140.00 | $0.00 |
| A.F. | 11/26/2018 | 11/29/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $625.00 | $0.00 |
| A.F. | 11/28/2018 | 12/21/2018 | 81201 | GENE ANALYSIS (ADENOMATOUS POLYPOSIS COLI), FULL GENE SEQUENCE | $785.00 | $0.00 |
| A.F. | 11/28/2018 | 12/21/2018 | 81317 | GENE ANALYSIS (POSTMEIOTIC SEGREGATION INCREASED 2 [S CEREVISIAE]) FULL SEQUENCE ANALYSIS | $710.00 | $0.00 |
| A.F. | 11/28/2018 | 12/21/2018 | 81404 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 5 GENETIC ANALYSIS | $840.00 | $538.66 |
| A.F. | 11/28/2018 | 12/21/2018 | 81405 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 6 GENETIC ANALYSIS | $610.00 | $590.64 |
| A.F. | 11/28/2018 | 12/21/2018 | 81406 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 7 GENETIC ANALYSIS | $570.00 | $554.44 |
| A.F. | 11/28/2018 | 12/21/2018 | 81407 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 8 GENETIC ANALYSIS | $850.00 | $829.34 |
| A.F. | 11/28/2018 | 12/21/2018 | 81408 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 9 GENETIC ANALYSIS | $2,010.00 | $1,960.00 |
| A.F. | 11/28/2018 | 12/21/2018 | 81432 | TEST FOR DETECTING GENES ASSOCIATED WITH INHERITED BREAST CANCER-RELATED DISORDERS, GENOMIC SEQUENCE ANALYSIS, AT LEAST 5 GENES | $850.00 | $821.56 |
| A.F. | 11/28/2018 | 12/18/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $950.00 | $0.00 |

| A.F. | 11/13/2018 | 11/27/2018 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $295.00 | $285.53 |
|------|------------|------------|-------|------------------------------------------|---------|---------|
| A.F. | 11/13/2018 | 11/27/2018 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $455.00 | $0.00 |
| A.F. | 11/13/2018 | 11/27/2018 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $175.00 | $0.00 |
| A.F. | 11/13/2018 | 11/27/2018 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $175.00 | $0.00 |
| A.F. | 11/13/2018 | 11/27/2018 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $175.00 | $0.00 |
| A.F. | 11/13/2018 | 11/27/2018 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $70.00 | $64.38 |
| A.F. | 11/13/2018 | 11/27/2018 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $80.00 | $73.93 |
| A.F. | 11/13/2018 | 11/27/2018 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $70.00 | $64.03 |
| A.F. | 11/13/2018 | 11/27/2018 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $175.00 | $0.00 |
| A.F. | 11/13/2018 | 11/27/2018 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $90.00 | $0.00 |
| A.F. | 11/13/2018 | 11/27/2018 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $140.00 | $134.26 |
| A.F. | 11/13/2018 | 11/20/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $625.00 | $0.00 |

160.     As demonstrated in the chart below, claims for genetic tests were submitted to Medicare on behalf of Selecta for beneficiary PD on November 13, 2018, and Medicare paid for those claims on December 10, 2018. Claims for genetic tests were again submitted to Medicare on behalf of Selecta for beneficiary PD on December 21, 2018, and Medicare paid for those claims on January 18, 2019. Again, claims for genetic tests were submitted to Medicare on behalf of Selecta for beneficiary PD on January 8, 2019, and Medicare paid for those claims on January 28, 2019. Genetic testing claims for PD were also submitted on behalf of Selecta on September 4 and December 13, 2018, but Medicare declined to pay for those claims. The list of genetic tests ordered for beneficiary PD is below. The total amount Medicare paid for PD's genetic tests on those dates was $ 5,671.36, although the amount billed on behalf of Selecta was $ 19,775. PD resided in the state of Georgia, but PD's genetic tests were ordered by Dr. Leslie Ballard, who practiced in

California. Dr. Ballard did not have a treatment relationship with PD.

| Beneficiary Initials | Claim Submission Date | Claim Paid Date | Procedure Code | Genetic Testing Description | Amt Billed | Amt Paid To Provider |
|---|---|---|---|---|---|---|
| P.D. | 12/21/2018 | 01/18/2019 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $900.00 | $285.53 |
| P.D. | 12/21/2018 | 01/18/2019 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $800.00 | $441.89 |
| P.D. | 12/21/2018 | 01/18/2019 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $626.00 | $0.00 |
| P.D. | 12/21/2018 | 01/18/2019 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $530.00 | $0.00 |
| P.D. | 12/21/2018 | 01/18/2019 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $530.00 | $0.00 |
| P.D. | 12/21/2018 | 01/18/2019 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $396.00 | $64.38 |
| P.D. | 12/21/2018 | 01/18/2019 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $390.00 | $73.93 |
| P.D. | 12/21/2018 | 01/18/2019 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $416.00 | $64.03 |
| P.D. | 12/21/2018 | 01/18/2019 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $530.00 | $0.00 |
| P.D. | 12/21/2018 | 01/18/2019 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $391.00 | $0.00 |
| P.D. | 12/21/2018 | 01/18/2019 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $766.00 | $134.26 |
| P.D. | 12/21/2018 | 01/03/2019 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $2,985.00 | $0.00 |
| P.D. | 12/13/2018 | 12/21/2018 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $900.00 | $0.00 |
| P.D. | 12/13/2018 | 12/21/2018 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $800.00 | $0.00 |
| P.D. | 12/13/2018 | 12/21/2018 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $626.00 | $0.00 |
| P.D. | 12/13/2018 | 12/21/2018 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $530.00 | $0.00 |
| P.D. | 12/13/2018 | 12/21/2018 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $530.00 | $0.00 |
| P.D. | 12/13/2018 | 12/21/2018 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $396.00 | $0.00 |
| P.D. | 12/13/2018 | 12/21/2018 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $390.00 | $0.00 |
| P.D. | 12/13/2018 | 12/21/2018 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $416.00 | $0.00 |
| P.D. | 12/13/2018 | 12/21/2018 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $530.00 | $0.00 |
| P.D. | 12/13/2018 | 12/21/2018 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $391.00 | $0.00 |
| P.D. | 12/13/2018 | 12/21/2018 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $766.00 | $0.00 |
| P.D. | 12/13/2018 | 12/18/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $2,985.00 | $0.00 |
| P.D. | 01/08/2019 | 01/28/2019 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $900.00 | $0.00 |
| P.D. | 01/08/2019 | 01/28/2019 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $800.00 | $0.00 |
| P.D. | 01/08/2019 | 01/28/2019 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $626.00 | $0.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| P.D. | 01/08/2019 | 01/28/2019 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $530.00 | $0.00 |
| P.D. | 01/08/2019 | 01/28/2019 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $530.00 | $0.00 |
| P.D. | 01/08/2019 | 01/28/2019 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $396.00 | $0.00 |
| P.D. | 01/08/2019 | 01/28/2019 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $390.00 | $0.00 |
| P.D. | 01/08/2019 | 01/28/2019 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $416.00 | $0.00 |
| P.D. | 01/08/2019 | 01/28/2019 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $530.00 | $0.00 |
| P.D. | 01/08/2019 | 01/28/2019 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $391.00 | $0.00 |
| P.D. | 01/08/2019 | 01/28/2019 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $766.00 | $134.26 |
| P.D. | 01/08/2019 | 01/22/2019 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $2,985.00 | $0.00 |
| P.D. | 11/13/2018 | 12/10/2018 | 81201 | GENE ANALYSIS (ADENOMATOUS POLYPOSIS COLI), FULL GENE SEQUENCE | $785.00 | $0.00 |
| P.D. | 11/13/2018 | 12/10/2018 | 81317 | GENE ANALYSIS (POSTMEIOTIC SEGREGATION INCREASED 2 [S CEREVISIAE]) FULL SEQUENCE ANALYSIS | $710.00 | $0.00 |
| P.D. | 11/13/2018 | 12/10/2018 | 81404 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 5 GENETIC ANALYSIS | $840.00 | $538.66 |
| P.D. | 11/13/2018 | 12/10/2018 | 81405 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 6 GENETIC ANALYSIS | $610.00 | $590.64 |
| P.D. | 11/13/2018 | 12/10/2018 | 81406 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 7 GENETIC ANALYSIS | $570.00 | $554.44 |
| P.D. | 11/13/2018 | 12/10/2018 | 81407 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 8 GENETIC ANALYSIS | $850.00 | $829.34 |
| P.D. | 11/13/2018 | 12/10/2018 | 81408 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 9 GENETIC ANALYSIS | $2,010.00 | $1,960.00 |
| P.D. | 11/13/2018 | 12/10/2018 | 81432 | TEST FOR DETECTING GENES ASSOCIATED WITH INHERITED BREAST CANCER-RELATED DISORDERS, GENOMIC SEQUENCE ANALYSIS, AT LEAST 5 GENES | $850.00 | $0.00 |
| P.D. | 11/13/2018 | 12/03/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $950.00 | $0.00 |
| P.D. | 09/04/2018 | 09/12/2018 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $900.00 | $0.00 |
| P.D. | 09/04/2018 | 09/12/2018 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $800.00 | $0.00 |
| P.D. | 09/04/2018 | 09/12/2018 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $626.00 | $0.00 |
| P.D. | 09/04/2018 | 09/12/2018 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $530.00 | $0.00 |
| P.D. | 09/04/2018 | 09/12/2018 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $530.00 | $0.00 |
| P.D. | 09/04/2018 | 09/12/2018 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $396.00 | $0.00 |
| P.D. | 09/04/2018 | 09/12/2018 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $390.00 | $0.00 |
| P.D. | 09/04/2018 | 09/12/2018 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $416.00 | $0.00 |
| P.D. | 09/04/2018 | 09/12/2018 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $530.00 | $0.00 |

| P.D. | 09/04/2018 | 09/12/2018 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $391.00 | $0.00 |
| P.D. | 09/04/2018 | 09/12/2018 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $766.00 | $0.00 |
| P.D. | 09/04/2018 | 09/07/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $2,985.00 | $0.00 |

161. As demonstrated in the chart below, claims for genetic tests were submitted to Medicare on behalf of Selecta for beneficiary WCH on January 8, 2019, and Medicare paid for those claims on January 30, 2019. Claims for genetic tests were again submitted to Medicare on behalf of Selecta for beneficiary WCH on January 9, 2019, and Medicare paid for those claims on January 28, 2019. Claims for genetic tests were also submitted to Medicare on behalf of Selecta for beneficiary WCH on November 13, 2018, but Medicare declined to pay for those claims. The list of genetic tests ordered for beneficiary WCH is below. The total amount Medicare paid for WCH's genetic tests on those dates was $ 1,111.20, although the amount billed on behalf of Selecta was $ 14,450. WCH resided in the state of Georgia, but WCH's genetic tests were ordered by Dr. Leslie Ballard, who practiced in California. Dr. Ballard did not have a treatment relationship with WCH.

| Beneficiary Initials | Claim Submission Date | Claim Paid Date | Procedure Code | Genetic Testing Description | Amt Billed | Amt Paid To Provider |
|---|---|---|---|---|---|---|
| W.C.H. | 01/08/2019 | 01/30/2019 | 81201 | GENE ANALYSIS (ADENOMATOUS POLYPOSIS COLI), FULL GENE SEQUENCE | $785.00 | $0.00 |
| W.C.H. | 01/08/2019 | 01/30/2019 | 81317 | GENE ANALYSIS (POSTMEIOTIC SEGREGATION INCREASED 2 [S CEREVISIAE]) FULL SEQUENCE ANALYSIS | $710.00 | $0.00 |
| W.C.H. | 01/08/2019 | 01/30/2019 | 81404 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 5 GENETIC ANALYSIS | $840.00 | $269.33 |
| W.C.H. | 01/08/2019 | 01/30/2019 | 81405 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 6 GENETIC ANALYSIS | $610.00 | $295.32 |
| W.C.H. | 01/08/2019 | 01/30/2019 | 81406 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 7 GENETIC ANALYSIS | $570.00 | $277.22 |
| W.C.H. | 01/08/2019 | 01/30/2019 | 81407 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 8 GENETIC ANALYSIS | $850.00 | $0.00 |
| W.C.H. | 01/08/2019 | 01/30/2019 | 81408 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 9 GENETIC ANALYSIS | $2,010.00 | $0.00 |
| W.C.H. | 01/08/2019 | 01/30/2019 | 81432 | TEST FOR DETECTING GENES ASSOCIATED WITH INHERITED BREAST CANCER-RELATED DISORDERS, GENOMIC SEQUENCE ANALYSIS, AT LEAST 5 GENES | $850.00 | $0.00 |

| W.C.H. | 01/08/2019 | 01/24/2019 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $950.00 | $0.00 |
|---|---|---|---|---|---|---|
| W.C.H. | 01/09/2019 | 01/28/2019 | 81201 | GENE ANALYSIS (ADENOMATOUS POLYPOSIS COLI), FULL GENE SEQUENCE | $785.00 | $0.00 |
| W.C.H. | 01/09/2019 | 01/28/2019 | 81317 | GENE ANALYSIS (POSTMEIOTIC SEGREGATION INCREASED 2 [S CEREVISIAE]) FULL SEQUENCE ANALYSIS | $710.00 | $0.00 |
| W.C.H. | 01/09/2019 | 01/28/2019 | 81404 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 5 GENETIC ANALYSIS | $840.00 | $269.33 |
| W.C.H. | 01/09/2019 | 01/28/2019 | 81405 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 6 GENETIC ANALYSIS | $610.00 | $0.00 |
| W.C.H. | 01/09/2019 | 01/28/2019 | 81406 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 7 GENETIC ANALYSIS | $570.00 | $0.00 |
| W.C.H. | 01/09/2019 | 01/28/2019 | 81407 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 8 GENETIC ANALYSIS | $850.00 | $0.00 |
| W.C.H. | 01/09/2019 | 01/28/2019 | 81408 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 9 GENETIC ANALYSIS | $2,010.00 | $0.00 |
| W.C.H. | 01/09/2019 | 01/28/2019 | 81432 | TEST FOR DETECTING GENES ASSOCIATED WITH INHERITED BREAST CANCER-RELATED DISORDERS, GENOMIC SEQUENCE ANALYSIS, AT LEAST 5 GENES | $850.00 | $0.00 |
| W.C.H. | 01/09/2019 | 01/23/2019 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $950.00 | $0.00 |
| W.C.H. | 11/13/2018 | 02/01/2019 | 81201 | GENE ANALYSIS (ADENOMATOUS POLYPOSIS COLI), FULL GENE SEQUENCE | $785.00 | $0.00 |
| W.C.H. | 11/13/2018 | 02/01/2019 | 81317 | GENE ANALYSIS (POSTMEIOTIC SEGREGATION INCREASED 2 [S CEREVISIAE]) FULL SEQUENCE ANALYSIS | $710.00 | $0.00 |
| W.C.H. | 11/13/2018 | 02/01/2019 | 81404 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 5 GENETIC ANALYSIS | $840.00 | $0.00 |
| W.C.H. | 11/13/2018 | 02/01/2019 | 81405 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 6 GENETIC ANALYSIS | $610.00 | $0.00 |
| W.C.H. | 11/13/2018 | 02/01/2019 | 81406 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 7 GENETIC ANALYSIS | $570.00 | $0.00 |
| W.C.H. | 11/13/2018 | 02/01/2019 | 81407 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 8 GENETIC ANALYSIS | $850.00 | $0.00 |
| W.C.H. | 11/13/2018 | 02/01/2019 | 81408 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 9 GENETIC ANALYSIS | $2,010.00 | $0.00 |
| W.C.H. | 11/13/2018 | 02/01/2019 | 81432 | TEST FOR DETECTING GENES ASSOCIATED WITH INHERITED BREAST CANCER-RELATED DISORDERS, GENOMIC SEQUENCE ANALYSIS, AT LEAST 5 GENES | $850.00 | $0.00 |
| W.C.H. | 11/13/2018 | 01/30/2019 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $950.00 | $0.00 |

162.   As demonstrated in the chart below, claims for genetic tests were submitted to Medicare on behalf of Selecta for beneficiary VG on November 13, 2018, and Medicare paid for those claims on December 7, 2018. Claims for genetic tests were again submitted to Medicare on behalf of Selecta for beneficiary VG on December 27, 2018, and Medicare paid for those claims on January 10, 2019. Claims for genetic tests were also submitted to Medicare on behalf of Selecta

for beneficiary VG on September 4 and December 13, 2018, but Medicare declined to pay for those claims. The list of genetic tests ordered for beneficiary VG is below. The total amount Medicare paid for VG's genetic tests was $ 5,095.21, although the amount billed on behalf of Selecta was $ 13,500. VG resided in the state of South Carolina, but VG's genetic tests were ordered by Dr. Leslie Ballard, who practiced in California. Dr. Ballard did not have a treatment relationship with VG.

| Beneficiary Initials | Claim Submission Date | Claim Paid Date | Procedure Code | Genetic Testing Description | Amt Billed | Amt Paid To Provider |
|---|---|---|---|---|---|---|
| V.G. | 12/13/2018 | 12/20/2018 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $900.00 | $0.00 |
| V.G. | 12/13/2018 | 12/20/2018 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $800.00 | $0.00 |
| V.G. | 12/13/2018 | 12/20/2018 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $626.00 | $0.00 |
| V.G. | 12/13/2018 | 12/20/2018 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $530.00 | $0.00 |
| V.G. | 12/13/2018 | 12/20/2018 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $530.00 | $0.00 |
| V.G. | 12/13/2018 | 12/20/2018 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $396.00 | $0.00 |
| V.G. | 12/13/2018 | 12/20/2018 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $390.00 | $0.00 |
| V.G. | 12/13/2018 | 12/20/2018 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $416.00 | $0.00 |
| V.G. | 12/13/2018 | 12/20/2018 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $530.00 | $0.00 |
| V.G. | 12/13/2018 | 12/20/2018 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $391.00 | $0.00 |
| V.G. | 12/13/2018 | 12/20/2018 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $766.00 | $0.00 |
| V.G. | 12/13/2018 | 12/18/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $2,985.00 | $0.00 |
| V.G. | 12/27/2018 | 01/10/2019 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $900.00 | $285.53 |
| V.G. | 12/27/2018 | 01/10/2019 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $800.00 | $0.00 |
| V.G. | 12/27/2018 | 01/10/2019 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $626.00 | $0.00 |
| V.G. | 12/27/2018 | 01/10/2019 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $530.00 | $0.00 |

| V.G. | 12/27/2018 | 01/10/2019 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $530.00 | $0.00 |
|---|---|---|---|---|---|---|
| V.G. | 12/27/2018 | 01/10/2019 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $396.00 | $64.38 |
| V.G. | 12/27/2018 | 01/10/2019 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $390.00 | $73.93 |
| V.G. | 12/27/2018 | 01/10/2019 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $416.00 | $64.03 |
| V.G. | 12/27/2018 | 01/10/2019 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $530.00 | $0.00 |
| V.G. | 12/27/2018 | 01/10/2019 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $391.00 | $0.00 |
| V.G. | 12/27/2018 | 01/10/2019 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $766.00 | $134.26 |
| V.G. | 12/27/2018 | 01/04/2019 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $2,985.00 | $0.00 |
| V.G. | 11/13/2018 | 12/07/2018 | 81201 | GENE ANALYSIS (ADENOMATOUS POLYPOSIS COLI), FULL GENE SEQUENCE | $785.00 | $0.00 |
| V.G. | 11/13/2018 | 12/07/2018 | 81317 | GENE ANALYSIS (POSTMEIOTIC SEGREGATION INCREASED 2 [S CEREVISIAE]) FULL SEQUENCE ANALYSIS | $710.00 | $0.00 |
| V.G. | 11/13/2018 | 12/07/2018 | 81404 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 5 GENETIC ANALYSIS | $840.00 | $538.66 |
| V.G. | 11/13/2018 | 12/07/2018 | 81405 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 6 GENETIC ANALYSIS | $610.00 | $590.64 |
| V.G. | 11/13/2018 | 12/07/2018 | 81406 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 7 GENETIC ANALYSIS | $570.00 | $554.44 |
| V.G. | 11/13/2018 | 12/07/2018 | 81407 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 8 GENETIC ANALYSIS | $850.00 | $829.34 |
| V.G. | 11/13/2018 | 12/07/2018 | 81408 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 9 GENETIC ANALYSIS | $2,010.00 | $1,960.00 |
| V.G. | 11/13/2018 | 12/07/2018 | 81432 | TEST FOR DETECTING GENES ASSOCIATED WITH INHERITED BREAST CANCER-RELATED DISORDERS, GENOMIC SEQUENCE ANALYSIS, AT LEAST 5 GENES | $850.00 | $0.00 |
| V.G. | 11/13/2018 | 12/03/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $950.00 | $0.00 |
| V.G. | 09/04/2018 | 09/11/2018 | 81225 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 19) COMMON VARIANTS | $900.00 | $0.00 |
| V.G. | 09/04/2018 | 09/11/2018 | 81226 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY D, POLYPEPTIDE 6) COMMON VARIANTS | $800.00 | $0.00 |
| V.G. | 09/04/2018 | 09/11/2018 | 81227 | GENE ANALYSIS (CYTOCHROME P450, FAMILY 2, SUBFAMILY C, POLYPEPTIDE 9) COMMON VARIANTS | $626.00 | $0.00 |
| V.G. | 09/04/2018 | 09/11/2018 | 81230 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 4) FOR COMMON VARIANT | $530.00 | $0.00 |
| V.G. | 09/04/2018 | 09/11/2018 | 81231 | GENE ANALYSIS (CYTOCHROME P450 FAMILY 3 SUBFAMILY A MEMBER 5) FOR COMMON VARIANT | $530.00 | $0.00 |
| V.G. | 09/04/2018 | 09/11/2018 | 81240 | GENE ANALYSIS (PROTHROMBIN, COAGULATION FACTOR II) A VARIANT | $396.00 | $0.00 |
| V.G. | 09/04/2018 | 09/11/2018 | 81241 | GENE ANALYSIS (COAGULATION FACTOR V) LEIDEN VARIANT | $390.00 | $0.00 |
| V.G. | 09/04/2018 | 09/11/2018 | 81291 | GENE ANALYSIS (5, 10-METHYLENETETRAHYDROFOLATE REDUCTASE) COMMON VARIANTS | $416.00 | $0.00 |

| V.G. | 09/04/2018 | 09/11/2018 | 81328 | GENE ANALYSIS (SOLUTE CARRIER ORGANIC ANION TRANSPORTER FAMILY, MEMBER 1B1) FOR COMMON VARIANT | $530.00 | $0.00 |
|------|------------|------------|-------|------------------------------------------------------------|---------|-------|
| V.G. | 09/04/2018 | 09/11/2018 | 81355 | GENE ANALYSIS (VITAMIN K EPOXIDE REDUCTASE COMPLEX SUBUNIT 1) COMMON VARIANTS | $391.00 | $0.00 |
| V.G. | 09/04/2018 | 09/11/2018 | 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $766.00 | $0.00 |
| V.G. | 09/04/2018 | 09/07/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $2,985.00 | $0.00 |

163.     As demonstrated in the chart below, claims for genetic tests were submitted to Medicare on behalf of Selecta for beneficiary ED on November 28, 2018, and Medicare paid for those claims on December 26, 2018. The list of genetic tests ordered for beneficiary ED is below. The total amount Medicare paid for ED's genetic tests on those dates was $ 5,987.52. ED resided in the state of Arizona, but ED's genetic tests were ordered by Dr. Tarik Farrag, who was not practicing in Arizona. Dr. Farrag did not have a treatment relationship with ED.

| Beneficiary Initials | Claim Submission Date | Claim Paid Date | Procedure Code | Genetic Testing Description | Amt Billed | Amt Paid To Provider |
|----------------------|----------------------|-----------------|----------------|-----------------------------|------------|---------------------|
| E.D. | 11/28/2018 | 12/26/2018 | 81201 | GENE ANALYSIS (ADENOMATOUS POLYPOSIS COLI), FULL GENE SEQUENCE | $785.00 | $0.00 |
| E.D. | 11/28/2018 | 12/26/2018 | 81317 | GENE ANALYSIS (POSTMEIOTIC SEGREGATION INCREASED 2 [S CEREVISIAE]) FULL SEQUENCE ANALYSIS | $710.00 | $692.88 |
| E.D. | 11/28/2018 | 12/26/2018 | 81404 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 5 GENETIC ANALYSIS | $840.00 | $538.66 |
| E.D. | 11/28/2018 | 12/26/2018 | 81405 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 6 GENETIC ANALYSIS | $610.00 | $590.64 |
| E.D. | 11/28/2018 | 12/26/2018 | 81406 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 7 GENETIC ANALYSIS | $570.00 | $554.44 |
| E.D. | 11/28/2018 | 12/26/2018 | 81407 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 8 GENETIC ANALYSIS | $850.00 | $829.34 |
| E.D. | 11/28/2018 | 12/26/2018 | 81408 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 9 GENETIC ANALYSIS | $2,010.00 | $1,960.00 |
| E.D. | 11/28/2018 | 12/26/2018 | 81432 | TEST FOR DETECTING GENES ASSOCIATED WITH INHERITED BREAST CANCER-RELATED DISORDERS, GENOMIC SEQUENCE ANALYSIS, AT LEAST 5 GENES | $850.00 | $821.56 |
| E.D. | 11/28/2018 | 12/18/2018 | 81479 | MOLECULAR PATHOLOGY PROCEDURE | $950.00 | $0.00 |

## COUNT I
### False Claims Act: Presentation of False Claims
### (31 U.S.C. § 3729(a)(1) and (a)(1)(A))

164.    The United States repeats and realleges paragraphs 1 through 163 of this Complaint as though fully set forth herein.

165.    By virtue of the acts described above, AIMA knowingly presented or caused to be presented to an officer or employee of the United States false or fraudulent Medicare claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1), amended by 31 U.S.C. § 3729(a)(1)(A); that is, AIMA knowingly made or presented, or caused to be made or presented, to the United States claims for payment for genetic tests for Medicare patients that were not medically necessary for the diagnosis or treatment of the patient, and that were not ordered by the patient's treating physician.

166.    Medicare would not have paid for these false or fraudulent claims submitted or caused to be submitted by AIMA had it known that the genetic tests were screening tests, were not medically necessary for the diagnosis or treatment of the patient, and were not ordered by the patient's treating physician. The false claims were therefore material to the United States' payment decision.

167.    AIMA presented or caused to be presented the false claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

168.    Because of these false or fraudulent claims, the United States suffered actual damages in an amount to be determined at trial, and therefore is entitled under the False Claims Act to treble damages plus a civil penalty for each false or fraudulent claim.

169.    AIMA knew or should have known that the claims were fraudulent and that it was not entitled to the fraudulently obtained government funds. AIMA had an obligation to return the

fraudulent payments/overpayments but instead ignored its duties, perpetuating the fraud.

**COUNT II**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**Causing to be Made or Used False Records or Statements**

170.    The United States repeats and realleges paragraphs 1 through 163 of this Complaint as though fully set forth herein.

171.    AIMA knowingly caused to be made or used a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B). By virtue of AIMA's actions and assistance, Selecta provided false records and statements to the Medicare program, including false representations in its claims and supporting records indicating that the genetic tests were medically necessary for the diagnosis or treatment of an illness or injury, when in fact those claims were not medically necessary.

172.    The false records and statements were made for the purpose of ensuring that Medicare paid the false or fraudulent claims, which was a reasonable and foreseeable consequence of AIMA's actions.

173.    The false records and statements caused to be made by AIMA were material to the payment of the false claims by the United States. In other words, the United States would not have paid the claims had it known that the statements were false.

174.    AIMA caused to be made or used such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

175.    Because of AIMA's acts, the United States suffered actual damages in an amount to be determined at trial, and therefore is entitled under the False Claims Act to treble damages plus a civil penalty for each false or fraudulent record or statement.

55

176.    AIMA knew or should have known that the statements or records were fraudulent and that it was not entitled to the fraudulently obtained government funds. AIMA had an obligation to return the fraudulent payments/overpayments but instead ignored its duties, perpetuating the fraud.

### Count III

### Unjust Enrichment

177.    The United States repeats and realleges paragraphs 1 through 163 of this Complaint as if fully set forth herein.

178.    Between 2018 and 2019, as a result of AIMA's actions, the United States paid for genetic tests that were not medically necessary for the diagnosis or treatment of the patient, and were not ordered by the patient's treating physician.

179.    By directly or indirectly obtaining federal funds from Medicare to which it was not entitled between 2018 and 2019, AIMA was unjustly enriched at the expense of the United States and is liable to pay such amounts to be determined and which, under the circumstances, in equity and good conscience, should be returned to the United States

### Count IV

### Payment by Mistake

180.    The United States repeats and realleges paragraphs 1 through 163 of this Complaint as if fully set forth herein.

181.    By virtue of AIMA's actions, based on mistaken understandings of fact, the United States paid by for genetic tests that were not medically necessary for the diagnosis or treatment of the patient, and were not ordered by the patient's treating physician

182.    The United States' mistaken understandings of fact were material to its decision to

pay the claims to Medicare that were submitted or caused to be submitted by AIMA for laboratory testing.

183.    The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of associated statements, certifications, and representations, paid monies directly or indirectly to AIMA to which AIMA was not entitled. Thus, the United States is entitled to recoup such monies, in an amount to be determined.

## **PRAYER FOR RELIEF**

The United States requests that judgment be entered in its favor and against AIMA as follows:

1.    On Counts I–II (False Claims Act), for treble the United States' damages, together with the maximum civil penalties allowed by law;

2.    On Count III (Unjust Enrichment), in the amount by which AIMA was unjustly enriched;

3.    On Count IV (Payment by Mistake), in the amount mistakenly paid to AIMA; and

4.    Pre- and post-judgment interest, costs, and such other relief as the Court may deem appropriate.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the United States requests a trial by jury.

Dated:  June 2, 2025                                 Respectfully submitted,

**HAYDEN P. O'BYRNE**
**UNITED STATES ATTORNEY**

*Clarissa Pinheiro*

CLARISSA PINHEIRO
Assistant United States Attorney
Florida Bar No. 0056784
99 N.E. 4th Street, Suite 300
Miami, Florida 33132
Tel.: 305.961.9310
clarissa.pinheiro@usdoj.gov

*Counsel for United States*