**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-22507-CIV-ALTONAGA/REID**

**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**AIMA BUSINESS AND MEDICAL SUPPORT, LLC**

Defendant.

**THE UNITED STATES OF AMERICA'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

The United States of America opposes Defendant AIMA Business and Medical Support, LLC's ("AIMA") motion to dismiss (ECF No. 14, "MTD" or "the Motion").

## INTRODUCTION

The Motion should be denied in its entirety. To please their client and profit financially, AIMA unlawfully billed the Government millions of dollars for medically unnecessary genetic tests on behalf of Excellent Laboratories Inc. d/b/a Selecta Laboratory ("Selecta"). The Government, and consequently federal taxpayers, wasted millions of dollars in federal healthcare funds on these medically unnecessary tests.

The Government's Complaint sets forth with particularity AIMA's illegal conduct that violated the False Claims Act ("FCA"). From approximately August 2018 through August 2019, AIMA billed the Medicare Program approximately $ 15,178,946.00 for medically unnecessary pharmacogenetic ("PGx") and cancer genetic ("CGx") testing on behalf of Selecta. (ECF No. 1, "Compl." ¶¶ 64, 150-53.) The United States' Complaint details precisely why AIMA had actual knowledge, acted with deliberate ignorance, or in reckless disregard that it was submitting false claims to Medicare – satisfying the FCA's scienter element. AIMA knew the requirements for billing Medicare, including statutory requirements and those outlined in Local Coverage Determinations ("LCDs"). Selecta hired AIMA precisely for its knowledge of those requirements.

(Compl. ¶¶ 79, 103-110, 127.) Among them was that Medicare only reimburses for genetic tests that are medically necessary – the tests must be ordered by a treating physician for the purpose of treating or diagnosing an illness or injury or improving the functioning of a malformed body member. (*Id.* ¶¶ 50, 53-60, 103-110.) AIMA also knew Selecta's business model was to sell genetic tests to Medicare beneficiaries, many of whom were elderly and vulnerable, through a call center. (*Id.* ¶¶ 118, 125-30.) The tests were, by their very nature, informational screening tests that were specifically excluded from Medicare coverage. (*Id.* ¶¶ 55-58, 106, 109.) Indeed, AIMA itself warned Selecta that Selecta's practice of collecting the DNA sample before the doctor's order was "completely not logical and illegal," while then advising Selecta either to omit the date of the doctor's consultation from the doctor's notes, or ensure that the DNA collection date matched the date on the doctor's notes, to avoid detection of the tests as being medically unnecessary and fraudulent. (*Id.* ¶¶ 127-29.)

The genetic testing scheme was very lucrative, and Selecta was paid millions of dollars by Medicare plans for the medically unnecessary CGx and PGx tests billed during that approximately one-year period. (*Id.* ¶ 150.) In turn, Selecta paid AIMA for its billing and consulting services, which were necessary for Selecta to obtain the Medicare reimbursements. (*Id.* ¶ 151.) The Complaint gives examples of medically unnecessary CGx and PGx tests for which AIMA actually billed the Government, for a set of 10 Medicare beneficiaries, and the amounts Medicare ultimately paid for these genetic tests. (*Id.* ¶¶ 154-63.) For example, for one Medicare beneficiary alone, beneficiary J.H., Medicare paid $ 7,051.54 for medically unnecessary genetic tests. (*Id.* ¶ 156.)

The Motion ignores much of the Complaint, improperly relies on facts outside the Complaint and adverse inferences during the motion to dismiss stage, and conflicts with established law. The Complaint contains detailed and specific allegations that are more than sufficient to state a claim for relief and meet the pleading requirements of Federal Rules of Civil Procedure 8(a) and 9(b). The Motion should be denied.

## LEGAL STANDARD

### I. The United States' allegations must be accepted as true, and the United States must plead fraud with particularity.

When considering a 12(b)(6) motion to dismiss, the Court must accept as true all facts set forth in the plaintiff's complaint and limit its consideration to the pleadings and exhibits attached thereto. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, (2007); *Wilchombe v. TeeVee Toons*, Inc.,

555 F.3d 949, 959 (11th Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has 'facial plausibility' when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Dismissal under Rule 12(b)(6) is inappropriate unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004) (citation omitted).

Cases brought under the FCA are subject to the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure. *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002). Thus, to comply with Rule 9(b), an FCA complaint must allege "facts as to time, place and substance of the defendant's alleged fraud and the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Corsello v. Lincare*, 428 F.3d 1008, 1012 (11th Cir. 2005) (quotations and citations omitted). Rule 9(b), while requiring particularity to allege fraud, must not be interpreted to "abrogate the concept of notice pleading." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001). And unlike fraud, under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind" can be alleged generally. Fed. R. Civ. P. 9(b).

## ARGUMENT

### I. The Motion should be denied because the United States' Complaint pleads with particularity that AIMA, individually, violated the False Claims Act.

The Complaint lays out in detail the actions AIMA and its employees took to ensure Selecta got paid for medically unnecessary genetic tests, including: formulating the most lucrative genetic testing panels rather than panels designed to diagnose or treat patients (Compl. ¶¶ 87-100); advising Selecta to persuade physicians to order the most lucrative genetic tests (*id.* ¶ 93); using administrative staff rather than appropriate experts to develop the most lucrative genetic testing panels (*id.* ¶ 100); continuing to bill Medicare despite multiple rejections and denials without questioning the propriety of the billing (*id.* ¶¶ 131-42); advising Selecta how to paper medical records to hide fraud (*id.* ¶¶ 127-29); and reviewing and approving patient medical records that did not support the medical necessity of the tests (*id.* ¶¶ 111-117). The Complaint also specifies that all claims for PGx or CGx testing were false and provides examples of the billing, delineating

each claim for PGx or CGx testing, how much AIMA and Selecta billed, and how much Medicare paid. (*Id.* ¶¶ 69, 77, 122, 129, 154-63.)

The Complaint alleges the overall fraudulent scheme and detailed actions taken by various individuals and entities, including AIMA, its CEO Aaron Liston, and AIMA employees Mark Goodman and Scott Jones. Although AIMA suggests it is "impossible to parse through" which actions were taken by whom, this contention is disingenuous in light of the Complaint's detailed allegations. (MTD at 5.)

When alleging misconduct by a corporation, the United States need not specify each individual actor within the corporation that took each individual action. *See U.S. ex rel. Groat v. Boston Heart Diagnostics*, 255 F.Supp. 3d 13, 22 (D.D.C. 2017) (quoting *U.S. ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015)) ("The complaint makes clear . . . that corporate levers were pulled; identifying precisely who pulled them is not an exorable requirement" for sufficient pleading under Rule 9(b)). Alleging that AIMA, a corporate entity and therefore a "person" under the FCA, engaged in fraud by taking certain actions pleaded with specificity, is sufficient to satisfy Rule 9(b). *Heath*, 791 F.3d at 125.

## II. The Motion should be denied because the Complaint adequately alleges that AIMA presented false claims for medically unnecessary genetic tests. (Count I)

### *A. The Complaint identifies with particularity false claims presented to and paid by the Government.*

AIMA asserts that the United States does not plead with particularity specific false claims presented or submitted to the Government, demanding multiple levels of detail for each of the Government's allegations. (MTD at 6-8.) But "Rule 9(b) does not require the United States to allege each and every detail about each and every false and fraudulent claim submitted to the United States." *U.S. ex rel. Borges v. Doctor's Care Medical Ctr., Inc.*, No. 01-8112-CIV, 2007 WL 9702639, at *13 (S.D. Fla. Jan. 29, 2007). "The purpose of Rule 9(b) is to provide Defendants with sufficient details of the 'precise misconduct with which they are charged,' so that they may prepare a proper defense." *Id.* (citing *Durham v. Business Mgmt Assoc.*, 847 F.2d 1505, 1511 (11th Cir. 1988), also citing *In re Cardiac Devices Qui Tam Litigation*, 221 F.R.D. 318, 333 (D. Conn. 2004) ("It is only common sense that the sufficiency of pleadings under Rule 9(b) may depend 'upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to

give notice to the adverse party and enable him to prepare a responsive pleading.'") (internal citation omitted)).

The Eleventh Circuit cases Defendant relies on are inapposite because they involve relators who, unlike the Government, had limited or no access to claims information and thus, did not plead that a claim had actually been submitted. In those cases, the Eleventh Circuit analyzed whether the facts alleged were sufficient to infer that a claim had actually been submitted; however, no such inference is needed here because the Complaint alleges with particularity claims that were *actually* submitted by AIMA on behalf of Selecta, and paid by Medicare.

For example, AIMA relies on *Clausen*, 290 F.3d 1301 (11th Cir. 2002) for the proposition that the Government must attach copies of "actually submitted bills or claims for payment" to meet the particularity requirement. (MTD at 6-7.) However, it was not the absence of "copies of actually submitted bills or claims for payments" that doomed relator's second amended complaint, but the fact that the relator failed to plead any of the specifics of an actually submitted bill or claim:

> No amounts of any charges by LabCorp were identified. No actual dates of claims were alleged. Not a single completed Form 1500 was provided. No policies about billing or even second-hand information about billing practices were described, other than to state that electronic Form 1500s with certain medical test codes were used. Basically, Clausen did not add any billing information to support his allegation that actual false claims were submitted for payment, such as the amount of any charges. Instead he attached one blank claim form and alleged that certain tests would have been billed on this form with certain test and diagnostic codes filled in.

*Id.* at 1306. Similarly, in *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350 (11th Cir. 2006), the Eleventh Circuit held that identifying "particular patients, dates and corresponding medical records" was insufficient because the relator "fail[ed] to provide the next link in the FCA liability chain: showing that the defendants *actually submitted* reimbursement claims for the services he describes. Instead he portrays the scheme and then summarily concludes that the defendants submitted false claims to the government for reimbursement." *Atkins*, 470 F.3d at 1359.[1] AIMA contends that the Government has made "nothing more than the suggestion that false claims 'must

[1] Unlike in *Atkins*, there is no risk of using discovery as a fishing expedition to find fraudulent claims because the Government has already identified the fraudulent claims that AIMA billed and that Medicare paid. *See id.* at 1359-60.

have been submitted, were likely submitted or should have been submitted.'" (MTD at 8.) But this is simply incorrect.

Defendant's reliance on *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 704-05 (11th Cir. 2014), is similarly in error. There, the Eleventh Circuit noted that the *Mastej* complaint did not "identify a single Medicare claim that was for a patient referred by any one of the ten doctors," in an FCA case alleging violations of Stark and the Anti-Kickback Statute. *Id.* (emphasis in original).

Nevertheless, the Eleventh Circuit found that some of relator's claims still had sufficient indicia of reliability to survive a Rule 9(b) challenge due to his personal knowledge of defendant's practices, including by attending meetings and discussing patients and billing. *Id.* at 707-09. Mastej's personal knowledge gave some of his allegations sufficient indicia of reliability that false claims were submitted during the time of his employment. *Id.* The court's findings do not apply to the Government's Complaint here because the Government need not rely on this personal knowledge exception to give its Complaint additional reliability – the Government, unlike relator Mastej, offered information about specific claims that were submitted and paid. For each beneficiary, the Complaint identifies the exact PGx or CGx tests that were billed (specified in the column "genetic testing description"), the exact procedure code for the medically unnecessary PGx or CGx test billed, the date AIMA submitted the claim, the date the claim was paid, the amount AIMA billed Medicare, and how much Medicare paid for each claim. (Compl. ¶¶ 154-63.) The claims data shows that in many cases, AIMA billed high amounts for PGx or CGx tests, but Medicare paid nothing because the claims were rejected or denied. Nevertheless, many fraudulent claims went through undetected, and Medicare paid for those claims. Indeed, AIMA admits that the Complaint "set[s] forth details of specific claims." (MTD at 7.) The Complaint comports with the purpose of Rule 9(b), which is "to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process." *Heath*, 791 F.3d at 125 (internal citation omitted).

Defendant's motion seems to argue that the Government cannot sufficiently state an FCA claim without a relator or insider who attended meetings with AIMA and Selecta, discussed the submission of bills to Medicare or Medicaid, or knew how services were billed. (MTD at 7.) For this proposition, AIMA relies on *Mastej*, *Clausen*, and two other Eleventh Circuit cases, yet none of these cases suggests that the Government cannot survive a Rule 9(b) challenge without an

insider. Nor would it make sense to impose such a requirement on the Government, which pursues civil remedies and criminal matters all the time, in many cases proving beyond a reasonable doubt that fraud occurred, without the need for a relator or similar insider. Nor should AIMA make any assumptions that the Government lacks similar inside information in this case.

***B. The Complaint adequately pleads falsity.***

At the pleading stage, the Government is required to *plead*, not *prove*, the existence of a false claim. Defendant argues that imprecise statements, differences of opinion, or disputed legal questions are insufficient to allege that a claim was false. (MTD at 8.) But it is Defendant who conflates and confuses the issues here. Defendant does not point to imprecise statements or differences of opinion on *legal* issues, as would be required to establish that the Government failed to state a claim. Rather, Defendant points to differences of opinion on the facts, which is improper for a motion to dismiss. "When Rule 9(b) applies to a complaint, a plaintiff is not expected to actually *prove* his allegations, and we defer to the properly pleaded allegations of the complaint." *Clausen*, 290 F.3d at 1313. On a motion to dismiss, the allegations must be viewed in the light most favorable to the plaintiff. *Mastej*, 591 F. App'x at 697.

Defendant cherry picks facts from the Complaint to argue they do not lead to "the conclusion that the claims at issue were false." (MTD at 10.) Defendant is really arguing that the allegations are not true and that the Government will not be able to prove them at trial. This is incorrectly asking the Court to make a factual finding at the motion to dismiss stage. Such disputes are not ripe for a motion to dismiss a complaint.

Defendant's own case law illustrates the difference between a disputed legal question, which could form the basis of a motion to dismiss, and disputed factual issues. In *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F. 3d 370, 376 (4th Cir. 2008), which Defendant relies on, the relators alleged a civilian contractor falsely represented in its government contract that it would adhere to certain terms and conditions related to safety and maintenance. *Id.* at 374. The Fourth Circuit found that the complaint did not sufficiently plead a false claim because "it is not exactly clear what would qualify as adequate (or inadequate) maintenance" and "the question of whether [the contractor] performed sufficient maintenance under the contract represents, at the very least, 'a disputed legal question.'" *Wilson*, 525 F. 3d at 377.

Here, the Government does not rely on vague or ambiguous language to establish the element of falsity. AIMA submitted claims for laboratory services that were not medically

necessary based on unambiguous language in a federal statute, regulations, and policy determinations and guidance detailed in LCDs.[2] (Compl. ¶¶ 50, 53-60, 103-110.) Unlike the undefined safety and maintenance requirements in *Wilson*, 42 U.S.C. § 1395y(a)(l)(A) states that Medicare reimburses only for services furnished to beneficiaries that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. . . ." 42 U.S.C. § 1395y(a)(l)(A). If the services, in this case genetic tests, are not for diagnosis, treatment, or improvement of bodily function, they are not covered.

The Complaint pleads that AIMA knew this and other related Medicare requirements and knew that its client Selecta used call centers to sell screening genetic tests to Medicare beneficiaries who were not being treated or diagnosed by their treating physicians. (Compl. ¶¶ 79, 103-110, 118, 125-28.) Selecta's business model involved soliciting Medicare beneficiaries to sell them as many of these screening genetic tests as possible. (*Id.* ¶¶ 69, 109, 118-25.) AIMA even knew that Medicare beneficiaries were swabbed for their DNA before a telemedicine doctor had even performed a consultation or signed an order requesting genetic testing. (*Id.* ¶¶ 125-28.) The Medicare claims for the genetic tests were false because the claims falsely represented to the United States that they were for genetic tests ordered by treating physicians and used for treatment or diagnoses.

Defendant argues there is nothing wrong with AIMA's focus on maximizing Medicare reimbursements and that such efforts do not equate to false claims. Indeed, if a provider maximizes profits by properly diagnosing or treating as many patients as possible and properly billing the Government for its services, maximizing profits is not illegal. But this is not what the Government alleges AIMA or Selecta did. Selecta's patients were not getting genetic tests under the direction of their doctors to treat or diagnose their illnesses. Selecta, with AIMA's knowledge, was selling genetic tests through telemarketing to any willing patient who satisfied certain conditions – i.e., patients that AIMA and Selecta believed would not get flagged by Medicare as ineligible. For AIMA and Selecta, achieving maximum profits was the driving factor that dictated which genetic tests got billed. The result was that Medicare, and consequently American taxpayers, paid millions of dollars for wasteful genetic tests that patients did not actually need. The claims for Medicare

---

[2] Defendant concedes that LCDs accurately explain Medicare billing requirements and that "Medicare providers and billers are expected to rely on LCDs for guidance." (MTD at 9.)

reimbursement were false because they falsely represented to the Government that the patients needed the tests, i.e., were medically necessary.

### *C. The Complaint properly alleges scienter, i.e., that Defendant acted "knowingly."*

AIMA misstates the pleading standard for alleging knowledge, claiming that the Government "fails to plead with the requisite particularity" precisely how and through whom AIMA obtained its knowledge of the false claims. (MTD at 12.) But the law does not require a plaintiff to look into a defendant's innermost thoughts to allege fraud. "At the pleading stage, 'knowledge, and other conditions of a person's mind may be alleged generally.'" *U.S. ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1224 (11th Cir. 2012) (quoting Fed. R. Civ. P. 9(b)). The Government here more than satisfies the pleading standard for knowledge, in some cases offering dates, names of individuals, and specific documents that demonstrate how and when AIMA knew or should have known it was submitting false claims.

As with the element of falsity, the Motion challenges the element of scienter with arguments that are improper at the pleading stage. For example, Defendant argues that evidence from outside the Complaint (from the rest of the September 27, 2018, email chain in Defendant's possession) demonstrates that "the government's interpretation of [the September 27 email] is not dispositive." (MTD at 12.) However, this question of fact is not appropriate at the motion to dismiss stage, where the Government's allegations must be taken as true.

AIMA references the Supreme Court's decision in *U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749 (2023). The Court in *SuperValu* was not reviewing a motion to dismiss, but it did explain what constitutes knowledge under the FCA – that "knowingly" submitting or causing to be submitted a false claim encompasses either actual knowledge, "deliberate ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information." *Id.* at 749-50 (citing 31 U.S.C. § 3729(b)(1)(A)). Citing relevant cases, the Court clarified that the term "'deliberate ignorance' encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity" and that "'reckless disregard' similarly captures defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway." *Id.* at 751. The facts alleged in the Complaint demonstrate that AIMA either had actual knowledge of the fraudulent scheme, was aware of a substantial risk that Selecta's claims were false but intentionally looked the other way, or was conscious of a substantial risk that the claims were false

but submitted them anyway.

The Complaint alleges that AIMA had knowledge of LCDs and statutory Medicare requirements for genetic testing, including that Medicare did not reimburse for genetic tests that were medically unnecessary. (Comp. ¶¶ 103-110.) The Complaint alleges AIMA had knowledge of 42 U.S.C. § 1395y(a)(l)(A), which provides that "no payment may be made" for items and services (with few exceptions not applicable here) that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." (*Id.* ¶¶ 106, 108.) The Government alleges AIMA knew that genetic tests for assessing susceptibility to cancer and performed for "genetic screening in the general population" would not be covered by Medicare because "[s]uch testing is considered screening and is excluded by Medicare statute" and "is considered not medically reasonable and necessary." (*Id.* ¶¶ 106, 109.)

The Complaint further alleges AIMA knew Selecta's business model, which was to contact Medicare beneficiaries through telemarketing calls, and this model "was precisely to offer informational genetic tests that were not ordered by the patient's treating physician, were not for the purpose of treating or diagnosing an illness or injury, and were therefore not covered by Medicare." (*Id.* ¶ 118.) The Government also alleges that AIMA knew Selecta was collecting beneficiaries' DNA without a doctor's consultation or doctor's order, that AIMA billed Medicare for Selecta's genetic tests anyway, and that AIMA even advised Selecta how to conceal in the medical records that the genetic tests were not for genuine treatment or diagnosis. (*Id.* ¶¶ 125-30.)

These facts alone are sufficient to plead that AIMA either had actual knowledge, showed reckless disregard, or deliberate ignorance that Selecta's claims for PGx and CGx tests were false. Yet, the Government pleads many more facts pertinent to AIMA's knowledge. For example, despite having knowledge of how Selecta's "telemedicine" business model worked, AIMA kept billing Medicare even though "Medicare was repeatedly denying or rejecting Selecta's claims for CGx and PGx testing reimbursement for various reasons, including for lack of medical necessity." (*Id.* ¶¶ 131-42.) AIMA encouraged Selecta to steer doctors towards ordering the most expensive genetic testing panels, rather than ordering genetic tests that were based on a patient's treatment, diagnosis, or medical needs. (*Id.* ¶¶ 90-94.) In the face of ample evidence that Selecta was developing and ordering genetic testing panels based on Medicare reimbursement amounts and not on patient needs, AIMA was instrumental in providing advice and developing the most lucrative panels. (*Id.* ¶¶ 87-99.) Moreover, AIMA was not relying on the advice of medical or

health care professionals to develop the genetic testing panels – AIMA determined which panels were "'getting really good reimbursement'" and added those genes to Selecta's genetic testing panels. (*Id.* ¶¶ 98-100.) AIMA held itself out as a knowledgeable billing company with compliance expertise and was hired by Selecta to provide Medicare billing and consulting services, yet AIMA entrusted its India-based employees, who generally provided administrative support, with developing genetic testing panels, advising Selecta how to steer doctors to order certain genetic tests, and advising Selecta how to manipulate patient records to make them appear compliant. (*Id.* ¶¶ 79, 87-100, 127-28.) AIMA's employees lacked the medical background to offer this type of advice and services, but AIMA entrusted them with that responsibility, billing the Medicare Program approximately $15,178,946.00 for CGx and PGx tests on behalf of Selecta. (*Id.* ¶¶ 64, 100.)

The deliberate ignorance and reckless disregard standards are intended to capture "an individual [who] has 'buried his head in the sand' and failed to make any inquiry that would have revealed the false claim." *U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp 2d 313, 330 (S.D.N.Y. 2004) (citation omitted). Congress's purpose in including these mental states was to "impose upon individuals and contractors receiving public funds 'some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek.'" *Id.* It is not only the provider who may be liable – a party submitting Medicare bills on someone else's behalf may violate the FCA by acting with reckless disregard. *See U.S. v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997) (finding wife who submitted Medicare bills on doctor's behalf acted with reckless disregard under the FCA). Here, AIMA either had actual knowledge, or at the very least, buried its head in the sand. The motion to dismiss should be denied.

***D. The Complaint plausibly states a claim that AIMA is liable for its role in the fraud.***

Far from being implausible as Defendant claims (MTD at 15-16), the Government's allegations more than sufficiently state a claim that AIMA is liable under the FCA. The criminal case *U.S. v. Patel*, No. 19-CR-80181-RAR, 2021 WL 2550477 (S.D. Fla. June 22, 2021), is instructive. In *Patel*, the defendant engaged in a scheme to sell CGx tests to Medicare beneficiaries, targeting them through telemarketing campaigns and health fairs to induce them to accept the CGx tests regardless of medical necessity. *Id.* at *1. Telemedicine doctors, who were not treating the beneficiaries, were paid to sign orders for CGx tests. *Id.* Judge Ruiz found that engaging in a scheme to encourage physicians to order medically unnecessary tests could subject a laboratory

owner to liability. *Id.* at * 9. Here, a billing company's participation in such a scheme likewise subjects AIMA to liability for its role in encouraging the medically unnecessary tests.

In *U.S. ex rel. Groat*, 255 F.Supp. 3d at 18-19, the court found the relator adequately alleged that claims for genetic tests were "legally false" where defendant certified the tests as medically necessary on CMS-1500 forms, although they were not. *Id.* at 22-24. The relator also adequately pleaded knowledge, including that the laboratory "knowingly target[ed] doctors who were not cardiac specialists and encourage[d] them to order specific tests that were medically unnecessary." *Id.* at 29-30. The court therefore denied defendant's motion to dismiss relator's presentment claim under 31 U.S.C. § 3729(a)(1)(A), as the Court should do here. *See id; see also U.S. v. Berkeley Heartlab, Inc.*, 225 F.Supp.3d 487, 495–97, 513–14 (D.S.C. Mar. 28, 2016) (declining to dismiss Government's FCA allegations against laboratory for "encourag[ing] physicians to order tests that were medically unnecessary").

## III. The Motion should be denied because the Government properly alleged Defendant AIMA caused to be made or used false records or statements material to false claims. (Count II)

The FCA also creates liability for anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). "To prove a use claim, a plaintiff must sufficiently allege the following three elements: '(1) the defendant made (or caused to be made) a false statement; (2) the defendant knew it to be false; and (3) the statement was material to a false claim.'" *U.S. v. Prometheus Labs, Inc.*, No. 8:18-CV-2931-T-33AAS, 2020 WL 6203527, at *5 (M.D. Fla. Oct. 22, 2020) (quoting *U.S. ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017)).

AIMA's conduct pleaded in the Complaint caused false certifications to be made, used, and submitted to federal health care programs. As alleged in the Complaint, certifications contained in CMS-1500 forms or their electronic equivalents are required and submitted along with claims to Medicare. (Compl. ¶¶ 39-43.) AIMA also caused false medical records and doctors' orders (or requisitions) to be made or used. Although the false medical records and requisitions were not in all cases actually submitted to federal programs, they were "made or used" and "material to a false or fraudulent claim," and therefore satisfy the conditions of 31 U.S.C. § 3729(a)(1)(B). The false certifications, false requisitions, and false medical records all constitute false records and statements that violated section 3729(a)(1)(B).

AIMA's billing services to Selecta included submitting genetic testing claims to the Government, which necessarily required CMS-1500 certifications to be submitted. (Compl. ¶¶ 39-40.) These forms certify to the Government that the services rendered are medically necessary and comply with "all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment." (*Id.*) The certifications were false because the genetic testing was not medically necessary and did not comply with Medicare laws, regulations, or program instructions for payment. By submitting the bills or claims to Medicare, AIMA caused the false statements to be made or used. (*Id.* ¶ 171.) The false statements were material to a false claim because they were a requirement for submitting the claims and for getting the claims paid. (*Id.* ¶ 173.)

The United States identifies 10 sample patients for whom AIMA submitted claims for medically unnecessary genetic testing on specific dates between 2018 and 2019, and pleads that false certifications were caused to be submitted with each claim. (*Id.* ¶¶ 40-43, 154-163, 171.)

Also as pleaded in the Complaint, AIMA submitted medical records to Medicare to support fraudulent genetic testing claims that had been denied payment by Medicare. (*Id.* ¶ 138.) The medical records submitted for Selecta beneficiaries included doctors' orders (requisitions) for medically unnecessary genetic testing and doctors' notes. (*Id.* ¶ 111.) The genetic testing was not being ordered for the purpose of treating or diagnosing an illness, was not ordered by the patient's treating physician, and was therefore false. As such, these genetic testing requisitions and doctors' notes were false records and statements that AIMA caused to be made and used that were material to false claims paid by the United States.

Unlike the "presentment" provision in 31 U.S.C. § 3729(a)(1)(A), which makes it a violation to present or cause to be presented a false claim, section 3729(a)(1)(B) does not mention "the concept of presentment." 552 U.S. at 671. This means that the false record or statement need not have been presented or submitted to the Government. *See Allison Engine Co., Inc. v. U.S. ex rel. Sanders,* 552 U.S. 662, 668-672, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008).[3] Other than this presentment requirement, section 3729(a)(1)(B) is "otherwise 'practically identical to the requirements for a count brought under section 3729(a)(1)(A) [the presentment provision],'" and

[3] Although *Allison Engine* was decided before amendments to the FCA that changed the "false records or statements" provision now codified at 31 U.S.C. § 3729(a)(1)(B), the lack of a "presentment" requirement remains in the statutory language. *See* 31 U.S.C. § 3729(a)(1)(B); *see also U.S. ex rel. Tra v. Fesen*, 403 F.Supp.3d 949 (D. Kansas 2019) (citing *Allison Engine*, 552 U.S. at 671).

many violations of one provision can be considered violations of the other. *See Fesen*, 403 F.Supp.3d at 963 (citing *U.S. ex rel. Scott v. Pac. Architects & Engineers (PAE), Inc.*, 270 F. Supp. 3d 146, 154 (D.D.C. 2017)). In *Fesen*, the court held that the Government had sufficiently stated a claim under section 3729(a)(1)(B) for making or using a false record or statement where the doctor's "[medical] records [were] false and were used to justify claims for the administration of [medication] when it was not medically indicated" and the Form 1500 submitted with each claim for payment required "express certification that the treatment [was] medically necessary." *Id.* at 963.

As discussed above, AIMA knew that Medicare only paid for genetic tests that were medically necessary and also knew that Selecta's business model involved billing for medically unnecessary genetic screening tests, yet billed Medicare anyway. Thus, the Government has adequately pleaded that AIMA "knowingly" caused to be made or used false records or statements as required for a violation of 31 U.S.C. § 3729(a)(1)(B). Additionally, the United States has offered 10 representative samples with ample claims information, as well as additional facts and descriptions, all allowing Defendant to clearly identify the alleged misconduct, including that all doctors' requisitions for CGx and PGx tests constituted false statements or records in this case.

## IV. The Government properly alleged common law unjust enrichment and payment by mistake. (Counts III and IV)

The common law claims against Defendant for payment by mistake and unjust enrichment satisfy pleading requirements. Defendant suggests these claims should be dismissed because the Government has provided insufficient facts or details to support them (MTD at 16), but courts have repeatedly upheld the pleading of common law claims, including unjust enrichment and payment by mistake, as alternative theories to the Government's FCA claims, even if they are duplicative and rely on the same operative facts. *See, e.g.*, *U.S. v. Adams,* 371 F.Supp.3d 1195, 1216 (N.D. GA 2019) (citing cases from various districts and circuits); *U.S. ex rel. Heesch v. Diagnostic Physicians Group, P.C.,* No. 11–0364–KD–B, 2014 WL 2154241, at *11 (S.D. Ala. May 22, 2014).

The Government's common law claims also do *not* require that all elements of the FCA are met. *See Heesch*, 2014 WL 2154241, at *11 (explaining that the Government may be entitled to recovery under theory of payment by mistake where it cannot establish FCA's knowledge requirement); *U.S. ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*, No. 6:09-cv-1002, 2013 WL

6017329, at *7 (M.D. Fla. Nov. 13, 2013) (explaining that such common law claims are available to the United States "independent of statute").

Courts have applied federal common law to claims of unjust enrichment and payment by mistake pleaded as alternative theories to an FCA claim. *See, e.g.*, *Adams,* 371 F.Supp.3d at 1216-17; *Baklid-Kunz*, 2013 WL 6017329, at *7; *U.S. v. Rogan*, 459 F.Supp.2d 692, 728 (N.D. Ill. 2006). Under the equitable common law theory of unjust enrichment, "a person is unjustly enriched if the retention of [a] benefit would be unjust." *Rogan*, 459 F.Supp.2d 692 at 728 (internal citation omitted). The elements of a federal common law unjust enrichment claim are: "(1) a benefit was conferred, (2) the recipient was aware that a benefit was received; and (3) under the circumstances, it would be unjust to allow retention of the benefit without requiring the recipient to pay for it." *U.S. ex rel. Cairns v. D.S. Med., LLC*, Case No. 1:12-cv-4, 2015 WL 590325, at *5 (E.D. Mo. Feb. 11, 2015). Importantly in this case, the United States may seek repayment from any party "to whom the funds flowed, not just the party to which they were directly given." *Id.* (citations omitted). Thus, the Government may recover funds from AIMA that were unjustly retained, even if Medicare originally paid Selecta directly.

The facts here support a claim for unjust enrichment. Contrary to Defendant's assertions in the Motion (MTD at 17), the Government alleged in the Complaint that AIMA received a benefit for its billing services and advice in the form of payments from Selecta. (Compl. ¶¶ 101, 151.) The payments from Selecta resulted from Medicare payments for medically unnecessary genetic tests. AIMA of course knew it was getting paid, and it would be unjust to allow AIMA to keep the payments without returning them to the United States.

The Government may recover on a claim of payment by mistake if it shows that it made payments "under an erroneous belief which was material to the decision to pay." *Cairns*, 2015 WL 590325, at *5*; see also Baklid-Kunz*, 2013 WL 6017329, at *7. The United States alleges that Medicare paid for the genetic testing without knowing it was medically unnecessary and not ordered by the patient's treating physician. (Compl. ¶¶ 166, 173.) Medicare's knowledge of the invalidity of the test requisitions would have been material to its decision to pay. *Id.* AIMA was paid for its role in obtaining the high reimbursements from Medicare and chose to retain those payments. Accordingly, the United States is entitled to seek recovery of these funds from AIMA, who participated in and benefitted from the scheme. *See U.S. ex rel. Silva v. VICI Mktg., LLC*, 361 F. Supp. 3d 1245, 1257 (M.D. Fla. 2019); *Cairns*, 2015 WL 590325, at *6 ("[T]he allegations that

Medicare and Medicaid mistakenly paid claims under the belief that [Defendants] were in compliance with the law, and that but for this mistaken belief they would have denied the claims, are sufficient to survive a motion to dismiss."); *U.S. v. Berkeley HeartLab, Inc.*, No. 9:14-230, 2017 WL 4803911, at *7-8 (D.S.C. Oct. 23, 2017) (denying defendants' motion for summary judgment as to payment by mistake and unjust enrichment claims where there was evidence supporting allegations that the United States had "paid the claims at issue under the erroneous belief that . . . Defendants had not tainted the claims with kickbacks.").

## V. In the event the Court grants the motion, it should do so without prejudice.

In the event the Court grants the motion to dismiss, the United States requests such an order be without prejudice to permit the United States to seek leave to amend its complaint. This Circuit has held that a plaintiff has the right to amend a complaint at least once to eliminate any deficiencies found by the court. *U.S. ex rel. Butler v. Magellan Health Servs., Inc.*, 74 F. Supp. 2d 1201, 1217 (M.D. Fla. 1999).

## CONCLUSION

For the foregoing reasons, the Motion should be denied and Defendant ordered to file a pleading responsive to the Complaint. If, however, the Court grants the Motion, the Government respectfully requests that the impacted counts of the Complaint be dismissed without prejudice to allow the Government an opportunity to plead its case in conformance with the Court's order.

Dated: August 19, 2025

Respectfully Submitted,

**JASON A. REDING QUIÑONES**
**UNITED STATES ATTORNEY**

By: <u>*Clarissa Pinheiro*</u>

**CLARISSA PINHEIRO**
Assistant United States Attorney
Fla. Bar. No. 0056784
United States Attorney's Office
99 N.E. 4th Street, 3rd Floor
Miami, Florida 33132
Tel: (305) 961-9310
E-mail: clarissa.pinheiro@usdoj.gov

*Counsel for the United States*